**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MICHAEL TERPIN,

               Plaintiff,

    -against-                        No.: 20-CV-3557 (CS) (LMS)

ELLIS PINSKY, as an individual; and DOES 1-
20, Inclusive,

               Defendants.

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ELLIS**
**PINSKY'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Cornelius P. McCarthy
CHEHEBAR DEVENEY & PHILLIPS
485 Madison Avenue   Suite 1301
New York, New York 10022
Tel.: 212-532-8204
Cell: 914-629-0687
Fax: 212-753-8101
E-mail: cmccarthy@cdlawllp.com

Pierce O'Donnell
Paul A. Blechner
GREENBERG GLUSKER FIELDS CLAMAN
  & MACHTINGER
2049 Century Park East, 26th Floor
Los Angeles, California 90067
Tel.:  310-201-7558
Cell:  310-480-3366
Fax:  310-201-1792
E-mail:  podonnell@greenbergglusker.com
           pblechner@greenbergglusker.com

Attorneys for Plaintiff
MICHAEL TERPIN

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.      PLAINTIFF STATES A CLAIM FOR RICO ........................................................... 3

      A.      Plaintiff Establishes the Elements of a RICO Claim ............................... 3

            1.      Plaintiff Has Properly Alleged a RICO Enterprise ...................... 4

                  a.      Plaintiff has properly pled the longevity of the Enterprise ........... 8

                  b.      Plaintiff alleges more than a mere criminal conspiracy ............... 10

            2.      There was a Continuing Pattern of Racketeering Activity ...................... 10

                  a.      Plaintiff has sufficiently alleged closed-end activity .................. 11

                  b.      Plaintiff has adequately alleged open-ended continuity ............. 13

II.     THE COMMON LAW CLAIMS CANNOT BE DISMISSED AS TIME BARRED OR FOR ANY OTHER REASON ............................................................... 16

      A.      The FAC Does Not Allege That Plaintiff's Claims Accrued In Puerto Rico And In Fact They Accrued In Nevada ............................................ 18

            1.      Accrual in Puerto Rico Does Not Appear on the Face of the FAC ........ 18

            2.      Determining the Place of Accrual Cannot be Decided in this Motion Because it is Fact Based and the Claims in Fact Accrued in Nevada ............................................................................. 21

      B.      Even if Plaintiff's Claims Accrued in Puerto Rico, the Claims are Timely Because they were Interrupted ...................................................... 23

            1.      Plaintiff Pled and Can Truthfully Allege An Extended Negotiation Process and Numerous Specific Facts that, Together With All Reasonable Inferences, Preclude this Motion ........................................ 23

            2.      If Puerto Rico Law Applies, Plaintiff's Restarted the Statute of Limitations with Numerous Specific Assertions of His Claims and Demands for Resolution ...................................................... 27

            3.      Defendant Urged and Agreed to a Process to Delay Filing and to Resolve this Matter that Froze and Extended the Puerto Rico Statute of Limitations ...................................................................... 29

            4.      Defendant Acknowledged the Obligation Both by Actions and Words, Which, at a Minimum, Restarted any Statute of Limitations Under Puerto Rico Law ...................................................... 31

      C.      Plaintiff's Replevin Claim Accrued In New York And Otherwise Cannot Be Dismissed ............................................................................ 33

III.    CONCLUSION ...................................................................................................... 35

83764-00004/3885263.3

# TABLE OF AUTHORITIES

**Page**

<span style="font-variant:small-caps">Cases</span>

*101 McMurray, LLC v. Porter*,
   2012 WL 997001 (S.D.N.Y. Mar. 26, 2012) ...........................................................................8

*Allen v. Dairy Farmers of America, Inc.*,
   748 F.Supp.2d 323 (D. Vt. 2010) ....................................................................................17, 22

*Allen v. Handzer*,
   148 Misc. 2d 334, 345,560 N.Y.S.2d 593 (Sup. Ct., NY Cty. 1990) ....................................21

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010)....................................................................................................7

*Bonilla-Aviles v. Southmark San Juan, Inc.*,
   992 F.2d 391 (1st Cir. 1993)............................................................................................28, 29

*Boykin v. KeyCorp*,
   521 F.3d 202 (2d. Cir. 2008)...................................................................................................7

*Boyle v. U.S.*,
   556 U.S. 938 (2009) ...................................................................................................... passim

*Broidy Capital Management LLC v. Muzin*,
   2020 WL 1536350 (D.D.C. 2020) ....................................................................................12, 13

*Bryan v. Wal-Mart Puerto Rico, Inc.*,
   951 F.Supp.2d 236 (D.P.R. 2013)..........................................................................................31

*Chiste v. Hotels.com L.P.*,
   756 F.Supp.2d 382 (S.D.N.Y. 2010)......................................................................................22

*Deutsche Bank Trust Co. Americas v. Doral Financial Corp.*,
   841 F.Supp.2d 593 (D. P.R. 2012)..............................................................................17, 25, 29

*DiVittorio v. Equidyne Extractive Industries, Inc.*,
   822 F.2d 1242 (2d. Cir. 1987)..................................................................................................7

*Evercrete Corp. v. H-Cap Ltd.*,
   429 F. Supp. 2d 612 (S.D.N.Y. 2006).....................................................................................12

*Feinberg v. Katz*,
   2002 WL 1751135 (S.D.N.Y. July 26, 2002) ...........................................................................8

*Fernandez Cortada v. Wal-Mart Puerto Rico, Inc.*,
   No. KLCEO 100832, 2002 WL 736208 (TCA Jan. 31, 2002)..........................................29, 31

*First Capital Asset Management, Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004).................................................................................................4, 5

*GICC Capital Corp. v. Technology Finance Group, Inc.*,
   67 F.3d 463 (2d Cir. 1995)....................................................................................................11

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*Glob. Fin. Corp. v. Triarc Corp.*,
  93 N.Y.2d 525 (1999) ...............................................................................18, 21

*Gucci America, Inc. v. Alibaba Group Holding Ltd.*,
  2016 WL 6110565 (S.D.N.Y. 2016) ...................................................................6

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
  492 U.S. 229 (1989) ..........................................................................4, 10, 11

*Harris v. City of New York*,
  186 F.3d 243 (2d Cir. 1999) ......................................................................16, 22

*In re Estate of McLaughlin*,
  78 A.D.3d 1304 (3d Dep't 2010) ....................................................................34

*In re Trilegant Corp., Inc.*,
  11 F. Supp. 3d 82 (D. Conn. 2014) ...................................................................6

*Int'l Brotherhood of Teamsters v. Carey*,
  297 F. Supp. 2d 706 (S.D.N.Y. 2004) ................................................................15

*Kery v. American Airline, Inc.*,
  931 F.Supp. 947 (D.P.R. 1995) ..............................................................25, 28, 29

*Mgt. Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*,
  883 F.2d 48 (7th Cir. 1989) ...........................................................................9

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) ...........................................................................6

*Ortiz v. Cornetta*,
  867 F.2d 146 (2d Cir. 1989) ..........................................................................17

*Phoenix Light SF Ltd. v. Deutsche Bank National Trust Co.*,
  172 F.Supp.3d 700 (S.D.N.Y. 2016) .................................................................17

*Rodriguez Narvaez v. Nazario*,
  895 F.2d 38 (1st Cir. 1990) ..............................................................24, 31, 32

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ...........................................................................19

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985) ..................................................................................3

*United Food and Commercial Workers v. Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) .......................................................................7, 8

*United States v. Aulicino*,
  44 F.3d 1103 (2d Cir. 1995) ......................................................................13, 14

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Coiro*,
    922 F.2d 1008 (2d Cir. 1991)..................................................................................14

*United States v. Cooper*,
    343 F. App'x 830 (3d Cir. 2009) ..............................................................................9

*United States v. Dixon*,
    167 F. App'x 841 (2d Cir. 2006) ..............................................................................9

*United States v. Harris*,
    695 F.3d 1125 (10th Cir. 2012) ...............................................................................9

*United States v. Indelicato*,
    865 F.2d 1370 (2d Cir. 1989) (en banc)..................................................................14

*United States v. King*,
    910 F.3d 320 (7th Cir. 2018) ....................................................................................9

*United States v. Northern Trust Co.*,
    372 F.3d 886 (7th Cir. 2004) ..................................................................................17

*United States v. Simmons*,
    923 F.2d 934 (2d Cir. 1991)....................................................................................14

*Valentin-Vega v. Allstate Ins. Co.*,
    2011 WL 1843156 (D.P.R.)....................................................................................32

*Weisman Celler Spett & Modlin, P.C. v. Trans-Lux Corp.*,
    2013 WL 2190071 (S.D.N.Y.)................................................................................18

*Zambrana Maldonada v. Commonwealth*,
    92 JTS 12, 129 DPR 740, 1992 WL 755000 (PR) (1992) .................................25, 29

**STATUTES**

18 U.S.C. § 1961(1) ........................................................................................................15

18 U.S.C. § 1961(4) ..........................................................................................................4

18 U.S.C. § 1962(c) ..........................................................................................................3

31 L.P.R.A. § 5298 ....................................................................................................18, 21

31 L.P.R.A. § 5303 ....................................................................................................24, 31

Cal. Civ. Proc. Code § 338 ............................................................................................18

Nev. Rev. Stat. Ann. § 11.190 ..................................................................................18, 21

N.Y. CPLR 202................................................................................................................16

iv

**TABLE OF AUTHORITIES**
(continued)

**Page**

**OTHER AUTHORITIES**

Fed. R. Civ. Proc. 8(c) ...................................................................................................17

Fed. R. Civ. Proc. 9(b) .....................................................................................................6

Fed. R. Civ. Proc. 12(b)(6) ......................................................................................17, 29

83764-00004/3885263.3

Plaintiff MICHAEL TERPIN ("Terpin" or "Plaintiff") respectfully submits the following opposition to the Motion to Dismiss (the "Motion") filed by defendant ELLIS PINSKY ("Pinsky" or "Defendant"), which seeks the dismissal of the First Amended Complaint ("FAC"):

## PRELIMINARY STATEMENT

Defendant Pinsky headed a criminal enterprise (hereinafter, the "Enterprise") involving numerous other cyber criminals, and, together, they engaged in wire fraud, money laundering, and aggravated identity theft using the relatively novel means of SIM-swapping.  The Enterprise, which started in 2015, took control of victims' phones, including (but by no means limited to) Plaintiff's phone, for the purpose of gaining control of and stealing from cryptocurrency accounts.  Although the technological means of the attacks are relatively novel, the result was a crime as old as time—theft of property belonging to the victims and the transfer of it to the members of the Enterprise.  Once identified and repeatedly confronted with Plaintiff's demand for full damages, Pinsky acknowledged his involvement on multiple different occasions, returned roughly $2 million of the $24 million that the Enterprise had stolen, and pleaded with Plaintiff not to file and to delay the entry of any judgment.  Now, by the Motion, after acknowledging his involvement and pleading with Plaintiff not to file earlier, Pinsky seeks to slide off into the sunset without any responsibility for the extensive harm that he caused.

The Motion must be denied.

As set forth below, Plaintiff has properly pled a RICO claim.  The statute itself is flexible and must be read broadly.  Defendant's reliance on cases that reject claims after trial or in the context of commercial entities or unions that were not inherently unlawful miss the mark here, where all favorable inferences must be drawn in Plaintiff's favor and the Enterprise itself was inherently unlawful and had no legitimate purpose.  As alleged in the FAC, the Enterprise has

operated since 2015, it engaged in multiple predicate acts of wire fraud, aggravated identity theft and money laundering in the course of hacking the accounts and stealing the cryptocurrency of Terpin and others, and it is not possible to engage in all of this illegal conduct without the structure, roles, and hierarchy brought to the task by an Enterprise. The FAC is replete with detail, both where it is required (as in the case of allegations of wire fraud against Plaintiff himself) but even where it is not (as, for example, in the extensive detail setting forth the Enterprise's effort to launder their ill-gotten gains and conceal their crimes).

As also set forth below, Plaintiff's common law claims for conversion, replevin, and money had and received are not time barred. To the extent any or all of those claims accrued outside New York and are therefore subject New York's borrowing statute, the FAC does not plead Plaintiff out of court. As with the RICO claims, Plaintiff is entitled to all reasonable inferences. The FAC is silent on the issue of where Plaintiff was at the time of the hack. Thus, it does not plead facts that compel the conclusion that these claims accrued in Puerto Rico. A resident of Nevada, Plaintiff was there when the Enterprise hacked his phone and stole his cryptocurrency on January 7, 2018, and if further amendment is necessary to address this issue, Plaintiff will provide it. As a result, if any non-New York statute of limitation must be borrowed here, it is Nevada's. Moreover, even if Puerto Rico's statute of limitations somehow applies, it was interrupted under Puerto Rico law. For all of these reasons, Plaintiff's claims were not remotely stale on the day they were filed.

As alleged in the FAC, Pinsky and the Enterprise are a racketeer influenced and corrupt organization *par excellence*. They have stolen at least $100 million from Terpin and others. They are certain they will never pay for their crimes, and for his part, in pretending that communications over close to a year and half either did not occur or did not interrupt any

2

limitations period, Pinsky raises arrogance to an art form. The Motion is as phony as the crocodile tears Pinsky is now shedding to try to escape his day of reckoning.  The Court should deny it.

**ARGUMENT**[1]

**I.   PLAINTIFF STATES A CLAIM FOR RICO**

    A.    Plaintiff Establishes the Elements of a RICO Claim.

To establish a violation of RICO, 18 U.S.C. § 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  As the Court stated in *Sedima*, the "statute requires no more than this. Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Id*.  RICO is to be read broadly and the Supreme Court has rejected importing narrowing interpretations into the statute to restrict RICO to particular types of criminal enterprises.  *Id*. at 497-98.

In *Boyle v. U.S.*, 556 U.S. 938, 946 (2009), the Supreme Court held that a RICO "enterprise" had to have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  This is a broad definition which does not require that a group "have a hierarchical structure or a 'chain of command.'"  *Id*. at 948-49.  Moreover, "the statute [is not] limited to groups whose crimes are sophisticated, diverse, complex or unique."  *Id.*

---

[1] The facts are as set forth in the FAC and are incorporated herein by reference.

RICO also requires a "pattern" of racketeering activity.  Although Congress intended a "flexible approach" to this requirement, a "pattern" requires more than "sporadic activity" and necessitates a showing of a "relationship" among the racketeering predicates and a "threat of continuing activity."  *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). (internal citations omitted).  "Continuity" may be shown in a variety of ways and can be a closed-end or an open-ended concept.  *Id*. at 241-42.  "Closed-end" continuity is shown by "proving a series of related predicates extending over a substantial period of time."  *Id*. at 242. "Open-ended continuity" in contrast depends upon the threat of continuity which can be shown by "the predicate acts or offenses [being] part of an ongoing entity's regular way of doing business." *Id*.

Plaintiff has alleged in the FAC that Defendant conducted the Enterprise through a pattern of racketeering activity consisting of perpetrating SIM swaps to steal cryptocurrency from multiple victims through predicate acts involving aggravated identity theft, wire fraud, money laundering, and extortion.

1.     Plaintiff Has Properly Alleged a RICO Enterprise.

Plaintiff has adequately alleged a RICO enterprise under 18 U.S.C. § 1961(4).  As the Court held in *Boyle*, the term "enterprise" is a broad and flexible one under RICO.  Key to the existence of an "enterprise" is that its members function as a unit and that it has an "ascertainable structure."  *See also First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174-75 (2d Cir. 2004).  Under Second Circuit precedent, the enterprise must also be "separate from the pattern of racketeering activity" which means only that there is "'an association of individuals' . . . that 'share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.'"  *Id*. at 174, *quoting First Nationwide Bank v. Gelt Funding Corp.*, 820 F.Supp. 89, 98 (S.D.N.Y. 1993).

Plaintiff here satisfies these requirements.  Plaintiff alleges that the separate Enterprise headed by Pinsky, and in which Truglia, Accomplice A, Accomplice B, and Accomplice C were a part, participated in numerous SIM swaps.  FAC ¶¶ 5, 8, 10, 24-26, 75-77, 91-94.  He further alleges that the members of the Enterprise had particular roles, including roles in regard to the key predicate acts of aggravated identity theft (identifying and impersonating their victims), wire fraud (transferring their victims' cryptocurrency in interstate commerce to new accounts under their control), money laundering (engaging in numerous transfers of cryptocurrency to hide their traces), and extortion of accomplices or victims.  FAC ¶¶ 9, 76-77, 91-94.  Plaintiff alleges that the members of the Enterprise functioned as a unit and that this structure was separate from the predicate acts committed against Plaintiff because it shared a "common purpose to engage in a particular fraudulent course of conduct and [to] work together to achieve such purpose." *First Capital*, *supra.  See* FAC ¶¶ 26, 38-56, 75-77.  The coordination, structure, and common purpose of the Enterprise is seen in its smooth, calculated, and efficient functioning in its hack of Plaintiff's cryptocurrency.  This was not the Enterprise's "first rodeo."

Defendant's claim that Plaintiff has not shown an Enterprise separate from the predicate acts is incorrect.  The FAC satisfies *Boyle* by alleging that the enterprise had a general criminal purpose (stealing cryptocurrency), relationships among those associated with the enterprise (coordinated roles in SIM swaps and sharing of the proceeds of the thefts of multiple victims), and longevity (existence for a number of years to commit multiple SIM swaps).  The existence of these attributes is sufficient to show a separate existence for the Enterprise.

Contrary to Defendant's assertion, the Enterprise's members did not engage in "parallel conduct" in the sense of "'conduct of the same nature and in the same time frame by different

actors in different locations.'"[2]  *Gucci America, Inc. v. Alibaba Group Holding Ltd.*, 2016 WL

6110565 at *6 (S.D.N.Y. 2016), *quoting Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297,

306-07 (S.D.N.Y. 2010).[3]  Although he may have engaged in separate criminal activity on his

own, the FAC alleges that Nicholas Truglia participated in and shared in the profits from the

Enterprise's criminal activity against Plaintiff.  Further, Plaintiff alleges that Truglia and other

Enterprise members worked together in regard to other SIM swaps.  FAC ¶¶ 57-64, 76-77.[4]

The FAC properly alleges that the Enterprise engaged in other SIM swaps and does not

merely "extrapolate" from the allegations regarding Plaintiff.  First, to be clear, there is no rule

against "extrapolation."  This is a standard that Defendant has simply made up.  However, and

although not obligated to do so, the FAC explains the basis for its allegations of these other SIM

swaps, which include Pinsky's claims to have massive cryptocurrency holdings, another specific

hack in which the Enterprise was engaged, and information derived from informants and Pinsky

---

[2] Unlike *Bangladesh Bank v. Rizal Commercial Banking* Corporation, 2020 WL 1322275 at *8 (S.D.N.Y. 2020), the Enterprise was associated as a group separate and apart from its alleged racketeering activity in regard to the Plaintiff and had a purpose other than to defraud Mr. Terpin.

[3] The use of the term "hub and spoke" in the FAC should not be taken as implying that the Enterprise had a structure "in which the spokes are separate, distinct and unassociated and whose actions are uncoordinated."  *See In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 82, 98-99 (D. Conn. 2014), *quoted in Gucci v. Alibaba Group, supra, at *5*.  Notwithstanding the FAC's one-time use of this phrase to describe the manner in which "Pinsky and other ringleaders" were "at the hub" and in control of "numerous spokes of other co-conspirators," the FAC alleges that members of Enterprise were very much associated with one another and engaged in coordinated action in furtherance of a common criminal purpose.  Indeed, in the same paragraph, the FAC alleges that two of the "spokes," namely Accomplice C and Individual X, were in communication with one another.  FAC ¶ 74.  As alleged, this is not a rimless wheel where the co-conspirators may not have known of the Enterprise's objectives.  Rather, each of them knew their roles, knew the Enterprise's objective, and knew that others had similar specific tasks that would together lead to their success, even though they may have been shielded from knowing the actual identity of the person working in the next cubicle over.  Defendant's reliance on this one reference and not the allegations in their totality is grasping at straws.

[4] The allegations in regard to the hack of Plaintiff indeed show the "contents of the communications, who was involved, [and] where and when they took place" and further explain why they were fraudulent. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (applying Rule 9(b) in a securities fraud case).  As to the hacks of other parties, Plaintiff properly alleges these on information and belief.

himself, including the sophisticated and efficient manner in which the Enterprise carried out this hack, as well as the unapologetic and calculated manner in which Pinsky went about seeking to cover up his activities and to pin the blame on Truglia after Plaintiff learned of Pinsky's involvement. *See* FAC ¶¶ 4, 6, 9-15, 29-34, 57-63, 65-67, 74-77, 91-94. As to facts relating to the SIM swaps of other victims, they are "peculiarly" within the knowledge of Defendants; thus, Plaintiff's allegations in regard to these victims are properly based on information and belief and pled with this less specificity. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d. Cir. 2008); *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d. Cir. 1987). Moreover, Plaintiff has pled the facts regarding the wire fraud predicate acts inflicted on him with particularity. FAC ¶¶ 38, 40-41, 43-46 (identifying the who, what, when, where, and why of the transfers of information and cryptocurrency, including conversion of Plaintiff's cryptocurrency to BTC).

The allegations of the FAC are strikingly different from those of *United Food and Commercial Workers v. Walgreen Co.*, 719 F.3d 849, 854-55 (7th Cir. 2013). There, the Seventh Circuit found that the complaint failed to allege that the defendants were operating a distinct "enterprise" as opposed to operating in their individual corporate capacities. Here, by contrast, the FAC alleges an Enterprise that operated a SIM swap fraud scheme against multiple victims separate and apart from the activities of the individual members. Indeed, the Enterprise's members appear to have been brought together because their individual skills were needed to pull off a successful SIM swap and the hack itself was carried out in coordinated manner with the various cogs working together, not independently. Unlike *United Food and Commercial Workers*, it is not possible in this case to pull off the scheme without coordination. Put

7

differently, "It takes an Enterprise"—not just individuals conducting their "own affairs." *Id*. at 854.

Plaintiff is also not seeking to stretch a single event by corporate parties into a criminal enterprise as Defendant claims. There is no plausible "legitimate" explanation for the actions of the Enterprise. As the FAC alleges, the Enterprise's members boasted of their criminal exploits, the millions of dollars they robbed from the victims they called stupid, their "never going to get caught" attitude, and the thrill they took in robbing victims. FAC ¶¶ 13-14, 65-67.

Plaintiff also alleges sufficient facts to distinguish this case from the conclusory allegations found deficient in other cases cited by Defendant such as *Feinberg v. Katz*, 2002 WL 1751135 at *16 (S.D.N.Y. July 26, 2002), and *101 McMurray, LLC v. Porter*, 2012 WL 997001 at *7 (S.D.N.Y. Mar. 26, 2012). For example, in *101 McMurray*, this Court found deficient "mere legal conclusions" stating that "each defendant shared in profiting from the fraudulently-obtained funds in amounts presently unknown to plaintiff" and that "all defendants conspired to obtain plaintiff's funds." In contrast, the FAC does not rely on similar boilerplate allegations and instead details the roles of the Enterprise members, the Enterprise's existence separate and apart from the theft of Plaintiff's cryptocurrency, and the Enterprise's *modus operandi*. FAC ¶¶ 38-56, 61-68, 76, 91-94.

 *a. Plaintiff has properly pled the longevity of the Enterprise.*

Plaintiff has also properly alleged the longevity of the Enterprise. The chart at FAC ¶ 38 does not (as Defendant clearly knows) relate to the longevity of the Enterprise, but rather details the predicate acts of the Enterprise regarding Mr. Terpin. The FAC elsewhere alleges that the Enterprise operated both before and most likely after the Terpin hack. FAC ¶¶ 53, 56, 61-63, 65, 76-77, 91-94. As noted, Plaintiff properly alleges these claims on information and belief.

The FAC's allegations are starkly different from those in *Mgt. Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 51 (7th Cir. 1989), which involved what was "essentially a contract dispute involving one 'victim,' one transaction between the parties, and, at most two predicate acts—the allegedly unauthorized copying of the contract programs and the allegedly unauthorized copying of the back-up tapes." In contrast, the FAC alleges an enterprise that was inherently criminal, that preyed on numerous victims other than plaintiff, and that committed in each instance from start to finish dozens of predicate acts.

Citing cases that arose after trial when the evidence was fully developed, Defendant argues that Plaintiff somehow has not established as a matter of law sufficient longevity for the Enterprise in question. Defendant's citations to the length of the criminal enterprises in *United States v. King*, 910 F.3d 320, 327 (7th Cir. 2018), *United States v. Harris*, 695 F.3d 1125, 1136 (10th Cir. 2012), *United States v. Cooper*, 343 F. App'x 830, 832 (3d Cir. 2009), and *United States v. Dixon*, 167 F. App'x 841, 843-44 (2d Cir. 2006), are irrelevant to this motion to dismiss. For the purposes of the Motion, the Court must accept the FAC's allegations as true that the Enterprise continued from 2015 until the present. FAC ¶¶ 91-95. In short, Defendant has cited no case that permits, let alone requires, the Court to ignore the FAC and rule as a matter of law that the Enterprise lacked sufficient longevity.

Defendant also distorts *Reves v. Ernst &* Young, 507 U.S. 170, 185 (1993), by omitting a key portion of the Supreme Court's holding. The issue in *Reeves* was the meaning of "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs"— not the meaning of the "longevity" of an enterprise. In considering a proposed test for "conducting" the affairs of an enterprise, the Court stated that "1962(c) <u>cannot be interpreted to reach complete 'outsiders</u>' because liability depends on showing that the defendants conducted

9

or participated in the conduct of the '*enterprise's* affairs' not just their '*own* affairs.'"

(Underlined portion omitted by Defendant.)  Plaintiff here alleges that Pinsky was at the heart of

the operation of the Enterprise and that he was far from an "outsider."  For the purposes of a

motion to dismiss, the Court should again accept Plaintiff's well-pleaded allegations as to the

nature, extent, and participants in the Enterprise.

       *b.*    *Plaintiff alleges more than a mere criminal conspiracy.*

       The FAC does not allege that there was a mere conspiracy between Truglia and Pinsky.

It instead alleges that they both participated in the Enterprise and its actions.  For example,

paragraph 92 of the FAC states that:

> Plaintiff alleges on information and belief that since at least 2015 Defendants Pinsky,
> non-defendant Truglia, Accomplices A, B and C and Defendants DOES 1-20 and other
> Enterprise members, knowingly, intentionally, and unlawfully, aided and abetted, and
> conspired with each other, to devise, or intend, multiple coordinated schemes to defraud
> cryptocurrency holders and investors and others (including Plaintiff), by which they
> illegally stole their victims' identities in order to illegally obtain and acquire control of
> victims' cryptocurrency and other accounts, and to launder the proceeds of these accounts
> and to transfer such proceeds to accounts under their control.

These allegations, which must be taken as true, clearly satisfy the existence of the Enterprise, the

role of its participants, and the Enterprise's separate existence apart from the predicate acts

committed on Mr. Terpin.

       2.    <u>There was a Continuing Pattern of Racketeering Activity.</u>

       In enacting RICO, Congress intended that a "flexible approach" be adopted as regards the

need for a continuing pattern of "racketeering activity" showing more than "sporadic activity"

and instead a "relationship" among the racketeering predicates and a "threat of continuing

activity."  *H.J. Inc.*, *supra*, at 239 (internal citations omitted).

       A "continuing pattern" of racketeering activity may be established by either "closed-end"

activity or "open-ended" activity.  Plaintiff here sufficiently alleges the existence of both types of

83764-00004/3885263.3

activity.  *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 466-67 (2d Cir. 1995).

   *a.*  *Plaintiff has sufficiently alleged closed-end activity.*

  Closed-end activity requires conduct occurring over "a substantial period of time."  *HJ. Inc.*, 492 U.S. at 242.  Although closed-end activity is relatively rare, activity that occurs over a "number of years" (rather than a "few weeks or months") is "substantial" enough to constitute closed-end activity.  Given that the FAC alleges that the Enterprise started in 2015 when Pinsky was only 13, continued through the hack of Mr. Terpin in 2018 when Pinsky was almost 16, and continued after Mr. Terpin's hack until 2019, the Enterprise lasted well over any two-year minimum required by the Second Circuit.  Even excluding the concealment of their actions in January 2019 (when Pinsky was nearly 17), the Enterprise extended well over two years.

  As noted above, Defendant is incorrect in repeatedly asserting that the acts alleged to have been undertaken by the Enterprise only occurred over "a period of days, during which the enterprise allegedly obtained Terpin's cryptocurrency through fraud, laundered the proceeds, and extorted a member of the enterprise who failed to convert the cryptocurrency as directed."  Def. Mem. at 15.  In so asserting, Defendant ignores Plaintiff's allegations that the actions of the Enterprise date back to 2015, which is three years before Plaintiff's hack, and that they continued after Plaintiff's hack.  *See* FAC ¶¶ 91-94.

  The Enterprise has been alleged to have engaged in a series of "related predicates extending over a substantial period of time," *i.e.*, from 2015 until 2019.  *Id*.  Plaintiff's pleading is not "hypothetical."  For example, Plaintiff alleges that all of the detailed conduct specified in Paragraph 92, quoted in full above, occurred "*since at least 2015*."  FAC ¶ 92 (emphasis added).

11

Moreover, the predicate acts for the SIM swaps was not "hacking" "without more,"[5] Def. Mem. at 17, but rather the violation of specific criminal code provisions related to aggravated identity theft, wire fraud, and money laundering.  Defendant's contrary assertion is frivolous. Plaintiff specifically alleges that the Enterprise committed these same RICO predicate acts from at least 2015 and not just during the period of the Terpin SIM swap.  FAC ¶¶ 91-94.  Moreover, the allegations meet the standard of *Evercrete Corp. v. H-Cap Ltd*., 429 F. Supp. 2d 612, 624-25 (S.D.N.Y. 2006), which found that continuity should be assessed in regard to the "nature of the RICO enterprise and of the predicate acts."  Plaintiff here properly alleges on information and belief the fact that the predicate acts were committed by the Enterprise on other victims.

Defendant's curious citation to *Broidy Capital Management LLC v. Muzin*, 2020 WL 1536350 (D.D.C. 2020), demonstrates that Plaintiff sufficiently alleges *both* closed-ended and open-ended continuity.  Indeed, the factual allegations of *Broidy* could hardly be more different from those in this case.

In *Broidy,* plaintiff, an "outspoken critic" of Qatar, sued defendants employed by Qatar (the "Qatari Enterprise") who allegedly retained a third party to hack plaintiff's servers and disseminate materials from the servers.  Id. at **1-2.  Plaintiff brought RICO claims against the Qatari Enterprise which were dismissed by the court.  The court first found that plaintiff had not alleged an "open-ended" scheme because the complaint did not allege that the defendants would again engage in conduct in violation of RICO.  Id. at *9.  The court found that the scheme lasted "for about five months" and was "not an ongoing scheme that continues to this day."  *Id.*

The court in *Broidy* further found that Plaintiff had not pled a closed-ended scheme because the time involved was too short (*i.e.*, five months) and consisted of a "single scheme"

---

[5] As Defendant acknowledges, Plaintiff does not contend that violation of the Computer Fraud and Abuse Act ("CFAA") constitutes a RICO predicate act.

involving a "few victims".  *Id*. at *10 ("[i]n sum, the alleged scheme had a single goal, targeted only a few victims, and took just five months from start to finish").

In contrast, Plaintiff alleges in the FAC that the criminal schemes of the Enterprise had multifarious goals of targeting multiple victims in order to rob cryptocurrency owners of their assets, and that these actions took place from at least 2015.  Plaintiff has thus adequately alleged an enterprise under the requisite RICO standards.[6]

     *b.*     *Plaintiff has adequately alleged open-ended continuity.*

Under the binding Second Circuit precedent of *United States v. Aulicino*, 44 F.3d 1103, 1111 (2d Cir. 1995), Plaintiff has established that there was a "risk of continuity" of the Enterprise because of the "inherently unlawful nature of the Enterprise."  The FAC adequately alleges that the Enterprise was inherently unlawful given the nature of its activities, which included aggravated identity theft in impersonating victims to obtain information about their accounts, including SIMs, the theft of cryptocurrency through wire fraud, money laundering of the cryptocurrency and extortion.  Indeed, it is difficult to imagine an enterprise that engages in any more inherently unlawful activity.  Defendant does not advance any plausible innocent explanation of the Enterprise's activities—nor is it conceivable, particularly at the pleading stage, that the Enterprise had a legitimate existence or purposes that have somehow been overlooked by Plaintiff (who is more than $20 million poorer because of its activities.)

In the face of this, Defendant yet again repeats his familiar mantra that Plaintiff is bootstrapping his own claim, that he has not pled fraud with sufficient particularity, and that he

---

[6] Although Plaintiff did not reference by name in FAC ¶ 77 the identity of another hack in which Pinsky was involved, the inclusion or non-inclusion of that company's name does not affect the adequacy of the allegation.  Further, Counsel's claim that their client "has no knowledge as to how that hack was conducted beyond what is contained in press reports because he has no involvement in it," Def. Mem at 19 n. 9, is meaningless, and, in any event, the claimed denial represents yet further disregard for the applicable pleading standard and is entirely irrelevant to the determination of the Motion.

has not sufficiently alleged that the Enterprise had other victims.  Rather than restating Plaintiff's responses to these repeated points, Plaintiff refers the Court to the arguments above.

Plaintiff has adequately alleged open-ended continuity that meets the *Aulicino* standard, *i.e.,* that "the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering activity was short." *Aulicino* at 1111.  Plaintiff's allegations are more than sufficient for purposes of defeating a motion to dismiss.  Notably, Defendant has proffered no case in which a court dismissed a RICO claim on a motion to dismiss where the Plaintiff, as here, pled what was an inherently illegal scheme affecting numerous victims over a period of time.  The cases cited by Defendant, including *Aulicino* itself, instead involved RICO convictions—not dismissal of claims.  *See United States v. Simmons*, 923 F.2d 934, 951 (2d Cir. 1991); *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991); and *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (en banc).

The FAC clearly satisfies the standard of alleging that the Enterprise engaged in inherently unlawful activity.  The FAC alleges multiple inherently unlawful predicate acts that violate the U.S. and N.Y. criminal codes—aggravated identity theft, wire fraud, money laundering, and threats and extortion.  Plaintiff further alleges that the Enterprise was bound together for a criminal purpose—*i.e.*, stealing from its victims.  Plaintiff has thus alleged "past conduct" with a "threat of repetition."

Moreover, the members of a RICO enterprise engaging in inherently unlawful acts are not immune because they stopped their criminal acts to divide up the spoils of the theft (as the Enterprise did here) or did not immediately proceed to another hack.  As the Court in *Boyle* stated, "[w]hile the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates

14

engage in spurts of activity punctuated by periods of quiescence." 556 U.S. at 948. Here it is alleged that Pinsky moved his money out of America, destroyed the computer used in the hack of Plaintiff, and, after Truglia's arrest, tried to frame the hack on Truglia. FAC ¶¶ 66, 72, 74.[7]

The allegations of the FAC are in dramatic contrast to yet another inapposite case on which Defendant places emphasis: *Int'l Brotherhood of Teamsters v. Carey* ("*IBT*"), 297 F. Supp. 2d 706 (S.D.N.Y. 2004). Plaintiff's claims in *IBT* arose out of a contested union election and allegations that the defendants defrauded IBT of funds that were used to promote the defendant's candidacy for re-election as IBT president. *Id*. at 708.

The court dismissed IBT's amended complaint because it did not allege facts sufficient to meet the continuity element of RICO. *Id*. at 714. Specifically, the court found that open-ended continuity was not established under the "inherently unlawful" standard or because the predicate acts were a "regular way of conducting defendant's ongoing legitimate business". *Id*. at 715, *citing H.J. Inc*. The *IBT* court found that there was no allegation that defendants had undertaken a scheme to pursue an unlawful goal, but rather that the conduct was taken for admittedly lawful goals such as self-enrichment or the "right to have elections conducted fairly." *Id.*

In contrast, there is no benign explanation for the acts taken by the Enterprise. As alleged, the goal of the Enterprise—pure and simple—was to steal the victims' cryptocurrency through SIM swaps and convert it to the control of the Enterprise after committing aggravated identity theft and laundering the proceeds to disguise the traces.

Finally, the Court should reject Defendant's irrelevant attempt to address disputed factual issues in a motion to dismiss because the Court must take as true the well pleaded allegations of

---

[7] Unlike *Bangladesh Bank*, 2020 WL 1322275 at *7, Plaintiff is not alleging "obstruction" by the Enterprise, but money laundering which is an appropriate predicate act under 18 U.S.C. § 1961(1). Moreover, the destruction of evidence and attempt to frame the hack on Truglia further demonstrate the inherent illegality of the Enterprise.

the FAC.  Thus, it is irrelevant that Defendant claims to have "no knowledge" as to other hacks

alleged in the FAC.  Nor is it relevant that he claims that the conduct of the Enterprise was

"terminable" because Pinsky's actions were "impetuous and ill-considered" and he has now

apparently thought better of them because "he is now an adult and is attending college."  Def.

Mem. at 25, n. 11.  However "ill-considered," the FAC properly alleges that Pinsky committed

these acts and inflicted over $20 million of harm (to be trebled) on Mr. Terpin.

Plaintiff has pled a valid RICO claim and the Motion should be denied.

## II.    THE COMMON LAW CLAIMS CANNOT BE DISMISSED AS TIME BARRED OR FOR ANY OTHER REASON

In Point I B of his brief, Defendant asserts that Plaintiff's common law claims for

replevin, conversion, and money had and received must be dismissed as time barred.  Def. Mem.

at 26 ff.  Audaciously disregarding his knowledge of plaintiff's repeated demands, his numerous

admissions, and the extended process that, at Pinsky's urging, delayed the filing of this action,

the gravamen of Defendant's claim is that (i) New York's borrowing statute, CPLR 202, requires

that Plaintiff, a non-New York resident, satisfy both the statute of limitations of New York and

that of the place where his claims accrued; (ii) those claims accrued in Puerto Rico, one of three

locations along with Nevada and California where Defendant has alleged his residence; (iii)

Puerto Rico's one year limitations period applies to Plaintiff's common law claims; and (iv) any

interruption of the one-year period under Puerto Rico's law ended on January 7, 2020 or four

month before this suit was commenced.

As set forth below, Defendant's argument fails.

The applicable law is well settled.  A motion to dismiss may only raise the affirmative

defense of the statute of limitations if it is apparent from the face of the complaint that the claim

is time barred.  *See, e.g., Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999) ("in the

statute of limitations context[,] dismissal is appropriate only if the complaint clearly shows that the claim is out of time"). At the pleading stage, "a complaint need not plead facts to avoid potential affirmative defenses." *Deutsche Bank Trust Co. Americas v. Doral Financial Corp.*, 841 F.Supp.2d 593, 600 (D. P.R. 2012); *see also United States v. Northern Trust Co.,* 372 F.3d 886 (7th Cir.  2004) ("Dismissal under Rule 12(b)(6) . . .  irregular, for the statute of limitations is an affirmative defense. *See* Fed. R. Civ.8(c).  A complaint states a claim on which relief may be granted whether or not some defense is potentially available. That is why complaints need not anticipate and plead around defenses").  In fact, a complaint can only be dismissed on that ground at that stage if a plaintiff "pleads [himself] 'out of court by alleging facts that are sufficient to establish the defense.'" *Deutsche Bank Trust Co. Americas v. Doral Financial Corp.*, *supra*, 841 F.Supp.2d. at 600.

In making these determinations, it is well-settled that "at the motion to dismiss stage, the court must 'draw all reasonable inferences in favor of the Plaintiffs.  A statute of limitations analysis is generally riddled with questions of fact which *the Defendants* must establish in order to bar Plaintiffs' claims. Because of this fact-intensive burden, '[a]ffirmative defenses such as the statute of limitations are generally not resolved with a motion to dismiss under Rule 12(b)(6).' Accordingly, '[u]nless the complaint alleges facts that create an ironclad defense, a limitations argument must await factual development.'" *Allen v. Dairy Farmers of America, Inc.*, 748 F.Supp.2d 323, 353-54 (D. Vt. 2010) (citations omitted); *see also Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) ("while a statute-of-limitations defense may be raised in a motion to dismiss under Fed. R. Civ. P. 12(b)(6), such motion should not be granted unless 'it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"); *Phoenix Light SF Ltd. v. Deutsche Bank National Trust Co.*, 172 F.Supp.3d

83764-00004/3885263.3

700, 710 (S.D.N.Y. 2016) ("questions of fact as to when claims accrued . . . and whether the statute of limitations should be tolled"; motion to dismiss tort claims as time barred denied); *Weisman Celler Spett & Modlin, P.C. v. Trans-Lux Corp.*, 2013 WL 2190071 at *2 (S.D.N.Y.) ("question of fact as to whether the statute of limitations was tolled . . . is all that is required to defeat a motion to dismiss").

Applying this well-settled law, Plaintiff has clearly not pled himself out of court and Plaintiff's common law claims cannot be dismissed.

A.     The FAC Does Not Allege That Plaintiff's Claims Accrued In Puerto Rico And In Fact They Accrued In Nevada.

1.     Accrual in Puerto Rico Does Not Appear on the Face of the FAC.

As an initial matter, Defendant cannot raise his statute of limitations argument in this Motion because his argument is not limited to the four corners of the FAC.  Specifically, Defendant's argument is premised on the assertion that Plaintiff's claims accrued in Puerto Rico,[8] but that assertion is not apparent on the face of the FAC.  Indeed, the only reference to Puerto Rico in the FAC is in Paragraph 22:

> Plaintiff Michael Terpin is a citizen of the United States who has a residence in Los Angeles County, California. Mr. Terpin obtained wireless services from AT&T Mobility, Inc. ("AT&T") in Los Angeles County in the mid-1990s. *Mr. Terpin is resident in California, Puerto Rico and Nevada*. Mr. Terpin continued at all times relevant to the allegations herein to receive wireless services from AT&T for a telephone number with a Southern California area code.

FAC ¶ 22 (emphasis added).

Under New York law, a claim accrues at the "place of injury" and "the place of injury is usually where plaintiff resides *and sustains the economic impact of the loss*."  *Glob. Fin. Corp. v.*

---

[8]   Accrual in Puerto Rico is a necessary predicate of Defendant's argument given that Nevada has a three-year limitations period (Nev. Rev. Stat. Ann. § 11.190), as does California (Cal. Civ. Proc. Code § 338), and Defendant seeks to rely on the one-year limitations period in Puerto Rico (31 L.P.R.A. § 5298).

*Triarc Corp.*, 93 N.Y.2d 525, 529-30 (1999) (emphasis added).  As Defendant acknowledges, *see* Def. Mem. at 26, 27, New York law sets two conditions for place of accrual – first, it must be a place where the plaintiff resides, and second, it must be a place where plaintiff sustains the loss.  If, as here, a plaintiff has multiple residences, the place of accrual is the place where the plaintiff initially sustains the loss.[9]  Because the FAC is silent on the issue of where Plaintiff was at the time of the January 2018 hack, its general allegation of Plaintiff's residence in California, Puerto Rico, and Nevada does not permit, let alone mandate, the conclusion that the claim accrued in Puerto Rico.  Accordingly, Defendant's assertion of a limitations defense at the pleading stage is improper.

Recognizing the importance of Plaintiff's location at the time of the hack, Defendant improperly seeks to go beyond the four corners of the FAC by asserting that the California federal court in Terpin's case against AT&T "held" that Plaintiff was in Puerto Rico at the time of the hack alleged in this case.  *See* Def. Mem. at 28 n. 13.  As discussed below, however, Plaintiff was in Nevada, not Puerto Rico, at the time of the January 2018 hack.  And Plaintiff has never asserted otherwise.  *See* Declaration of Pierce O'Donnell, dated October 16, 2020, ("O'Donnell Decl."), Exh. 7 (California AT&T Action, Complaint).[10]

---

[9]  As discussed in more detail below, in the event Defendant is permitted to raise this factual issue in the Motion, Defendant is factually wrong about where the injury was first felt, and cites to no pleading or admission by Plaintiff that he was in Puerto Rico and not in Nevada at the time of the January 2018 hack.  Equally significant, Defendant confirmed in the Motion that he agrees that the location of injury is part of the legal standard.  *See* Def. Mem. at 27 ("Given that the site of the injury is where Plaintiff resides *and felt the injury . . .*") (emphasis added).

[10]  The Court may take judicial notice of the filings in the civil case that Plaintiff has filed against AT&T relating to this January 2018 hack and a separate earlier hack.  *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).  The Complaint before the Court in connection with the ruling on the motion to dismiss shows that the only references by Plaintiff to Puerto Rico were in paragraphs 1, 15, and 66, and that none of these paragraphs state or suggest in any way that Plaintiff was in Puerto Rico at the time of the January 2018 hack.

Defendant's attempted reliance on the California court's statement is not a proper basis for circumventing the requirement that the statute of limitations defense must appear within the four corners of the FAC.  Although Plaintiff does not dispute that the Court may take judicial notice of the California court's statement, it should not, at least under these circumstances, treat the California court's statement in a motion to dismiss as a dispositive determination of a fact, especially when Plaintiff disputes that fact and the record in the California case reveals no basis for Pinsky's interpretation of the Court's statement.  Importantly, the California court's actual statement was that Terpin "was in Puerto Rico at the time of the incidents."  One possible interpretation that reconciles the California court's statement with the pleading in that action is that the California court was referring to "the incidents" relating to a different hack that occurred in June 2017, which preceded and was separate and distinct from the hack orchestrated and carried out by Defendant in January 2018.  Alternatively, and with all due respect to the California court, if its reference to "the incidents" included the January 2018, the statement was not correct and was not based on anything in the record.[11]  In any event, the California court's recitations of the "facts" on a motion to dismiss are not "findings" or "holdings" and cannot be binding here because the California AT&T action is not final.

As accrual in Puerto Rico does not appear on the face of the FAC, Defendant's motion to dismiss is improper and should be summarily denied on this basis alone.

---

[11]  Although it is unknown why the California court wrote the sentence as it did, there is nothing in the record in that action that supports the assertion that Plaintiff was in Puerto Rico at the time of the January 2018 hack.  And having scoured the record of the California cases relating to this hack, Defendant would surely have submitted any statement *by Plaintiff* in the California AT&T action that acknowledged Plaintiff being in Puerto Rico at the time of the January 2018 hack.

2.      Determining the Place of Accrual Cannot be Decided in this Motion Because it is Fact Based and the Claims in Fact Accrued in Nevada.

To the extent the Court concludes that the limitations issue is presented within the four corners of the FAC and that Plaintiff's claims did not accrue in New York (*but see* Point II C *infra*), the Motion should be denied because it is an equally reasonable inference that the claims accrued in Nevada, not Puerto Rico.

To the extent that the Court is troubled by the FAC's silence on this issue or believes that Plaintiff is obligated to plead where he was at the time of the January 2018 hack, Plaintiff will truthfully amend to allege that he regularly spends several months each year at his residence in Nevada, that he was physically in Nevada at the time of the January 2018 hack organized and carried out by Defendant and others, and that he was thus physically in Nevada in January 2018 when he first accessed his accounts and discovered that his cryptocurrency had been stolen. As a result, Nevada was the "place of injury" where he initially sustained "the economic impact of the loss," *Glob. Fin. Corp.*, *supra,* 93 N.Y.2d at 529-30, and Nevada's three-year limitations period (Nev. Rev. Stat. Ann. § 11.190), not Puerto Rico's one-year period (31 L.P.R.A. § 5298), is the one that must be borrowed and satisfied by Plaintiff.

In response, Defendant apparently seeks to write out of New York law the physical location requirement that he elsewhere acknowledges (and even sought to rely on). Specifically, Defendant erroneously asserts that where, as here, a plaintiff is resident in multiple states, New York's borrowing statute requires application of the non-New York limitations period that is the shortest. Def. Mem. at 27. This assertion is false. In New York, the only case in which the shortest period was chosen merely because it was the shortest is a case where it was actually *impossible* to determine whether the claim accrued in New York or New Jersey. *See Allen v.*

*Handzer*, 148 Misc. 2d 334, 345,560 N.Y.S.2d 593, 600 (Sup. Ct., NY Cty. 1990).[12]  Here, determining the place of accrual is not impossible—it is known when the hack occurred and Plaintiff was in Nevada at that time.  As Defendant concedes, under New York law, "a party can have more than one residence."  Def. Mem. at 27.  Plaintiff has a residence in Nevada, where he spends several months each year, and where he was located when Defendant stole his cryptocurrency.  As a consequence, the place of accrual is Nevada and its three-year limitations period applies.

Defendant cites *Chiste v. Hotels.com L.P.*, 756 F.Supp.2d 382 (S.D.N.Y. 2010), for the categorical assertion that, when a plaintiff resides in more than one state, New York applies "'the *shorter* of whichever state wherein the cause of action accrued.'" Def. Mem. at 27 (emphasis in original).  *Chiste*, however, does not say that.  The *Chiste* court's full statement makes clear that the court was choosing between *New York* and another jurisdiction—not among several foreign jurisdictions: "The borrowing statute requires that a court, when presented with a cause of action accruing outside New York[,] apply whichever statute of limitations is shorter – *New York's* or that of the state where the cause of action accrued." 757 F.Supp.2d at 410 (emphasis added). Here, as discussed above, the claims accrued in Nevada.  *See id.* ("In New York, 'a cause of action accrues at the time and in the place of the injury.'")  Accordingly, any comparison of limitation periods under *Chiste* must compare *New York* and *Nevada*.  There is nothing in *Chiste* that would introduce the limitations period of Puerto Rico given that the claim accrued in Nevada.

---

[12] In *Allen*, a products liability case, where the injury occurred depended upon when injury-causing bacteria entered plaintiff's uterus.  Because the exact time of entry could not be determined with precision, and plaintiff was in both New York and New Jersey at the different points when that could have occurred, there was no way to determine the actual place of injury. Here, there is no such proof problem.  Mr. Terpin was in Nevada on January 7, 2018, the day Defendant and the Enterprise hacked his phone and stole his cryptocurrency.

Defendant also claims that the Puerto Rico statute of limitations must be chosen to "guard against forum shopping by out-of-state plaintiffs by mandating use of the *shortest* statute of limitations available."  Def. Mem. at 27 *citing In re Coudert Bros. LLP*, 673 F.3d. 180 (2d Cir. 2012).  Before any specific non-New York limitations statute can be deemed "available," however, the court has to find that the claim actually accrued there.  Here, the claims accrued in Nevada.  In any case, Plaintiff certainly has not pled himself out of this claim and, at most, the place of accrual is a fact question that cannot be resolved on the pleadings.  Thus, the Motion should be denied.

       B.    <u>Even if Plaintiff's Claims Accrued in Puerto Rico, the Claims are Timely Because they were Interrupted.</u>

Even if Plaintiff's pendent claims are deemed to have accrued in Puerto Rico (which they cannot be in this Motion), Plaintiff has adequately pled facts relating to the interruption of the limitations period by extrajudicial communications that preclude granting any motion to dismiss.

       1.    <u>Plaintiff Pled and Can Truthfully Allege An Extended Negotiation Process and Numerous Specific Facts that, Together With All Reasonable Inferences, Preclude this Motion.</u>

As set forth in the FAC, in late December 2018, Plaintiff first became aware that Defendant has been part of the Enterprise and had participated in the January 2018 hack of Plaintiff's cryptocurrency.  FAC ¶¶ 61, 78.  On January 7, 2019, Plaintiff's attorneys—Messrs. O'Donnell and McCarthy—met with Defendant's attorney, John Siffert, Esq., told Mr. Siffert that Plaintiff intended to file suit against Defendant, and handed Mr. Siffert a copy of the complaint. FAC ¶ 79. The complaint handed to Mr. Siffert contained all the common law claims now alleged by Plaintiff—conversion, replevin, and money had and received.  *Id.*

Delivery of the draft complaint to Defendant's attorney constituted an "extrajudicial claim" under Puerto Rico's civil code made by Plaintiff's representatives on behalf of Plaintiff as

the holder of the claim. 31 L.P.R.A. § 5303. The complaint specifically named Defendant and requested the specific relief sought herein.  Consequently, upon being presented to Mr. Siffert, it immediately interrupted Puerto Rico's one-year limitations period.  *Rodriguez Narvaez v. Nazario*, 895 F.2d 38 (1ˢᵗ Cir. 1990).

In the 15 ½ months that followed—between January 7, 2019 when the draft complaint was delivered and April 24, 2020 when Defendant's lawyers communicated that Mr. Pinsky would not sign the draft settlement agreement—counsel engaged in numerous discussions. Defendant's counsel urged Plaintiff not to file and gave assurances that he was cooperating; Defendant acknowledged his involvement in the hack of Terpin's phone and the theft of his cryptocurrency; Defendant returned roughly $2 million in the form of cryptocurrency, cash, and a watch; Defendant continued to indicate his cooperation and desire to enter into a settlement agreement that would include a substantial judgment; and the parties engaged in discussions about such an agreement for an extended period, with Defendant's counsel repeatedly stressing the importance of delaying any judgment until the Fall of 2020. FAC ¶ 79. At no time did Defendant deny his involvement, and in addition to delivering a large payment in the form of cryptocurrency, cash, and an expensive watch, Defendant also provided information that he could have known only by virtue of his involvement.  FAC ¶ 79.

The Motion erroneously construes these allegations narrowly and improperly attempts to treat each statement in isolation rather than construing them in their totality.  In so doing, Defendant wrongly seeks to impose a heightened standard of pleading that does not apply, completely fails to give any credence to the uncontroverted legal standard that all reasonable inferences be drawn in Plaintiff's favor, and, notably, fails to identify any allegation that could properly be construed as Plaintiff pleading himself out of court.  The specificity required by

Defendant is not the law.  Further, Defendant's argument fails to acknowledge the remarkably low bar that exists under the applicable law, which confirms that both verbal and written communications are sufficient to interrupt the limitations period[13] and that any such conversations must be construed "liberally" in favor of interruption, not restrictively so as to avoid it, and must be analyzed in their "totality."  *Zambrana Maldonada v. Commonwealth*, 92 JTS 12, 129 DPR 740, 1992 WL 755000 (PR) (1992).[14]

Viewing the allegations liberally and in their totality as required by *Zambrana*, Plaintiff has sufficiently pled interruption.  It is reasonable to infer from the FAC's allegations that Plaintiff made specific demands to Defendant (beyond mere reminders) on multiple occasions, that Defendant made multiple acknowledgements as to his involvement and his liability, and that Defendant agreed—consistent with his specific urging for delay—to the extended and drawn out process that ensued.  There is certainly nothing in the FAC that precludes any of those inferences.

For example (and again drawing all reasonable inferences in Plaintiff's favor), it could reasonably be inferred from the FAC that:

> 1. After being presented with the draft complaint on January 7, 2019, Defendant urged that the complaint not be filed and the parties engaged in repeated efforts in the following 15½ months to reach a resolution without filing of a complaint.  O'Donnell Decl., ¶ 3.

---

[13] *See Deutsche Bank Trust Co., supra*, 841 F.Supp.2d at 603 ("Puerto Rico law imposes no formal requirements on extrajudicial tolling, permitting both verbal and written tolling. In fact, courts in this jurisdiction favor a liberal approach to extrajudicial tolling, with the conservation of rights . . . regarded as the norm." (citations omitted).

[14] Citing a 1990 First Circuit opinion and a 1980 opinion from the Supreme Court of Puerto Rico, Defendant incorrectly claims "extinctive prescription" must be interpreted "restrictively," Def. Mem. at 28-29.  But as the federal district court in Puerto Rico later explained in *Kery v. American Airline, Inc.*, 931 F.Supp. 947, 951-52 (D.P.R. 1995), Puerto Rico's Supreme Court abandoned that view in 1992 in *Zambrana Maldonada v. Commonwealth*, 92 JTS 12, 129 DPR 740, 1992 WL 755000 (PR) (1992).  Under that case, a tolling claim must be "*analyzed in its totality and in liberal fashion*" (emphasis added).

2. Defendant returned to Plaintiff cryptocurrency and other items with a total value of approximately $2 million.  FAC ¶ 37.  Defendant's counsel explained that the items returned had been expressly traced to what was taken from Plaintiff and were being returned without any conditions.  *See* O'Donnell Decl., ¶ 4.

3. On April 22, 2019, in a letter to Mr. Siffert, one of Plaintiff's lawyers, Mr. Blechner stated that the parties had to move from information sharing and disclosure to discussing "a resolution of Michael's civil claims." *Id.*, Exh. 1.

4. On May 10, 2019, Defendant's counsel provided Plaintiff with a list of the computer wallet addresses of the cryptocurrency that he believed belonged to Plaintiff.  *Id.*, Exh. 2.

5. On June 13, 2019, because no resolution had occurred, Mr. O'Donnell called Mr. Siffert and told him that Mr. Terpin would be suing Mr. Pinsky and others in federal court the next week.  *Id.* ¶ 7.

6. On that same date, and in response, Mr. Siffert replied "Oh, no!" and "You can have a judgment from Ellis [Pinsky] anytime."  *Id.* ¶ 8.

7. On July 24, 2019, Mr. Blechner sent Mr. Siffert another letter stating that Plaintiff's claims "for racketeering, conversion, money had and received, replevin and [a] permanent injunction" could be resolved by Defendant, *inter alia*, "stipulat[ing] to paying Mr. Terpin the sum of $22 million, which reflects Mr. Terpin's loss less a credit to Ellis of the fair market value at the time of the cryptocurrency, cash, and watch delivered to Mr. Terpin in February 2019, with such sum to be converted  into a judgment." *Id.*, Exh. 3. This sum is pretty much the same sum set forth in the demand in the FAC, *see* FAC ¶ 37, and, as explained in the July 24, 2019 letter, the sum of $22 million is the amount of the loss less a credit for the portion returned.

8. On September 10, 2019, Mr. Blechner sent Mr. Siffert another letter stating that Mr. Terpin's claims could be settled for payment of $22 million. O'Donnell Decl., Exh. 4. The September 10, 2019 letter specifically rejected Mr. Siffert's request to reduce the amount.  The letter proceeded to request a response by September 18, 2019, stating that Plaintiff needed to know "if we have an agreement in principle" before turning to the documentation contemplated to close the deal.  *Id.*

9.  On September 18, 2019, in response to Mr. Blechner's letters and after specifically being provided with a detailed set of terms in the July 24, 2019 letter and being told in the September 10, 2019 letter that Plaintiff would not reduce the settlement amount, Mr. Siffert sent an email which stated: "This is to confirm that Ellis agrees in principal (sic) to settle the matter along the lines we have discussed." *Id.*, Exh. 5.  Mr. Siffert then expressed his agreement that drafting would be complicated and stated he was available to discuss terms in more detail before the parties "put pen to paper." *Id.*

10.  In January 2020, Mr. Siffert confirmed his understanding and agreement that the drafting of the agreement needed to move forward as the parties were now approaching the date of Defendant's 18th birthday.  *Id.*, Exh. 6.

11.  Between then and March 2020, Plaintiff's attorneys drafted a settlement agreement, which was sent to Mr. Siffert on March 13, 2020. *Id.*, ¶ 13. The agreement and exhibits thereto set out the resolution that the parties had been discussing since at least July 2019, including that there would be entry of a judgment in the amount of $22 million.  *See id.*

12.  On April 24, 2020, Mr. Siffert reported that Defendant was rejecting the agreement and would not sign the agreement that had been drafted.  FAC ¶ 80; *see also* O'Donnell Decl., ¶ 14.

Although the above details were not specifically set forth in the FAC, the FAC's

allegations satisfy any notice obligation and, for purposes of the Motion, it can be  reasonably

inferred from the FAC's allegations that Plaintiff reasserted his rights several times during the

extended period of these discussions, that Defendant acknowledged liability on numerous

occasions, and that Defendant's repeated urging that a complaint not be filed against him

adopted a process that froze the limitations period.

Plaintiff does not seek to convert the Motion into a motion for summary judgment.  These

additional specifics are provided to substantiate the process that is broadly outlined in the FAC

and to refute Defendant's knowingly narrow and self-serving interpretation of events in which he

participated.  Indeed, these communications are largely referenced in contemporaneous writings

and in fact actually occurred.  If the Court concludes that such specificity is required in the

pleading, Plaintiff will truthfully amend his complaint to provide these additional allegations.

2.     If Puerto Rico Law Applies, Plaintiff's Restarted the Statute of Limitations with Numerous Specific Assertions of His Claims and Demands for Resolution.

Whether inferred or (if necessary) pled more specifically, Plaintiff made specific

demands that reset Puerto Rico's one-year limitations period on multiple occasions—January 7,

2019; April 22, 2019; June 13, 2019; July 24, 2019; September 10, 2019; and March 13, 2020.

And, with this action filed on May 7, 2020, any *one* of the communications in June, July, or

September 2019 or March 2020 would be sufficient to make the claims timely under Puerto Rico

27

law (even without getting into issues of additional extensions relating to COVID-19).  Thus, Defendant must establish that every one of these communications fails.  He cannot do so.

In each of these interactions, Plaintiff asserted his claims to Pinsky's representatives, his attorneys; Plaintiff referred to his claims (i) specifically by name (such as in the original delivery of the draft complaint as well as in the July 24, 2019 letter) or (ii) as Terpin's "civil claims" (which analyzed liberally and in totality to include the context of the previously provided draft complaint and then the July 24, 2019 letter is sufficiently specific); and Plaintiff was specific about the amount of the claim (which was set out in the draft complaint as roughly $24 million, and with a specific reference to $22 million in the July 24, 2019 and September 10, 2019 correspondence (which references the total sum of roughly $24 million less a $2 million credit for what was returned)).  Thus, each of these communications individually (and certainly all of them collectively) "made it fairly clear that redress for [Plaintiff's] injuries was the remedy sought." *Kery v. American Airlines, Inc.*, 931 F.Supp. 947, 954 (D.P.R. 1995).

Rather than acknowledge any of the foregoing as reasonably inferred, Defendant asks the Court to draw all inferences *against* Plaintiff and to proceed under an erroneous standard that would misleadingly characterize what occurred as non-specific "settlement negotiations" of the sort deemed insufficient in *Bonilla-Aviles v. Southmark San Juan, Inc.*, 992 F.2d 391 (1st Cir. 1993).  In *Bonilla-Aviles*, however, the court rejected plaintiff's claim that a single letter to defendant's insurance representative demanding "information about" policy coverage constituted an extrajudicial claim because the letter "fell far short of the specificity required to alert defendants to the particulars of a likely damages suit."  Here, as alleged above, the facts are in stark contrast to *Bonilla-Aviles*.

Plaintiff's extrajudicial communications were not non-specific settlement negotiations like in *Bonilla-Aviles* nor were they mere reminders or demands without "specific notice of the basis" therefor.  Def. Mem. at 29.  Instead, analyzed "liberally"—as Puerto Rico law requires—and in their "totality," *Zambrana Maldonada, supra*, 129 DPR at 760, each of Plaintiff's numerous demands constitute "extrinsic claims" under Article 31 of Puerto Rico's Civil Code.[15] *See also Deutsche Bank Trust Co. Americas v. Doral Financial Corp. supra* (demand, follow-up thereon, and refusal each sufficient to re-start limitations period; motion to dismiss denied).[16]

3. <u>Defendant Urged and Agreed to a Process to Delay Filing and to Resolve this Matter that Froze and Extended the Puerto Rico Statute of Limitations.</u>

Defendant also claims incorrectly that "although a qualifying act under [Puerto Rico's] statute starts the one-year limitations period running anew, the limitations period is not thereafter 'frozen' during settlement conversations; instead, a new qualifying act must occur to re-trigger the statutory tolling provision."  Def. Mem. at 30.  To the contrary, "new" acts re-start the limitations period and a single act along with an agreement to engage in a process that would lead to resolving the claim in fact does "freeze" the limitations period.  *See Fernandez Cortada v. Wal-Mart Puerto Rico, Inc.*, No. KLCEO 100832, 2002 WL 736208 (TCA Jan. 31, 2002).

---

[15] That the draft complaint was not given again to defense counsel in subsequent communications after January 7, 2019 does not render the communications mere reminders.  As the court explained in *Kery, supra*, 931 F.Supp. at 954, "there [are] a large number of instances – between the mere reminder that a debt exists and the pure claim – in which it must be concluded that the claim exists and that, therefore, the limitation period was interrupted."  All that is required is that the communication be "consider[ed] . . . conduct in which, with more or less subtlety, a decision to obtain payment is evidenced."  *Id.* Moreover, the communications from Plaintiff's attorney to defense counsel in June, July and September of 2019 directly and unequivocally informed Defendant of Plaintiff's claim and the amount of $22 million damages owed to Plaintiff in a settlement thus precluding dismissal under Rule 12(b)(6).

[16] Separate from Plaintiff's demands, Pinsky's communication of his agreement in principle on September 18, 2019 and his announcement on April 24, 2020 that he would not sign also reset the limitations period under *Deutsche Bank Trust Co. Americas, supra.*

As noted above, this occurred several times here.  Messrs. O'Donnell and McCarthy met with Mr. Siffert on January 7, 2019, *inter alia*, for the purpose of resolving Plaintiffs claims against Defendant.  Thereafter the parties engaged in a process of information sharing for that purpose.  When Plaintiff decided to abort that process in June 2019 and told Defendant the law suit would be filed the next week, Mr. Siffert immediately resurrected the process by claiming that "You can have a judgment from Ellis anytime."  To the extent Mr. Siffert's spontaneous and unequivocal statement is not an acknowledgment that restarts the clock, it conveyed a willingness to engage in a process to resolve the claims.

On the issue of a process to resolve the claims, the September exchange was even more explicit—following up on the more detailed statement of settlement terms in the July 24, 2019 letter, Mr. Blechner wrote on September 10, 2019 that the claims could be settled for payment of $22 million (the full amount less a credit for what had already been returned), explained that Plaintiff would not reduce the amount, and stated that Plaintiff needed to know "if we have an agreement in principle" before turning to the documentation contemplated to close the deal or that Plaintiff would proceed to file. Mr. Siffert responded eight days later: "This is to confirm that Ellis agrees in principal (sic) to settle the matter along the lines we have discussed." Mr. Siffert further agreed that the documentation would be complicated and proposed that the parties speak before putting "pen to paper."

Thereafter, when the parties turned to drafting settlement documents in early January 2020, Mr. Siffert confirmed that this was the agreed process by acknowledging that the parties were now approaching the date of Defendant's 18th birthday.  As all inferences must be drawn in Plaintiff's favor, there can be no refuting (at least for purposes of the Motion) that Pinsky agreed to a process to resolve the claims, which freezes the limitations period under Puerto Rico law,

after which it remained frozen until, at least, April 24, 2020, when Pinsky's communicated that he would not sign. *See* FAC ¶¶ 79-80.[17]

    4.    <u>Defendant Acknowledged the Obligation Both by Actions and Words, Which, at a Minimum, Restarted any Statute of Limitations Under Puerto Rico Law.</u>

The limitations period in this case was also interrupted and reset by Defendant's acknowledgment of his debt to Plaintiff. 31 L.P.R.A. §5303. "An 'act of acknowledgment of the debt by the debtor is 'any valid act which actually implies the [debtor's] absolute conformity with the right of the creditor.' The act must communicate the debtor's specific intention of acknowledging the survival of another person's right; it must be spontaneous, unequivocal and clear; and it can never be deduced from acts or conduct from which only indirect inferences can be made as to the debtor's acknowledgment of the effectiveness of the creditors rights." *Rodriguez Narvaez v. Nazario*, *supra*, 895 F.2d at 44.

Defendant acknowledged his debt to Plaintiff on multiple occasions without qualification, including in February 2019 when he delivered cryptocurrency and other assets to Plaintiff worth approximately of $2 million that he said were traceable to Plaintiff. (FAC ¶ 79). Then, in May, Defendant provided Plaintiff with the computer wallet addresses that were used by Pinsky and traceable back to Plaintiff. O'Donnell Decl., ¶¶ 4, 6, and Exhs. 1, 2. Next, in his conversation with Mr. O'Donnell in June 2019, Mr. Siffert promised that Plaintiff could have a judgment "anytime," which read in context must be construed as the judgment demanded in the draft complaint he had been given the prior January. On the common law claims, that judgment

---

[17] Defendant's reliance, *see* Def. Mem. at 30, on *Bryan v. Wal-Mart Puerto Rico, Inc.*, 951 F.Supp.2d 236 (D.P.R. 2013), is misplaced. Contrary to Defendant's claim, *Bryan* did not hold that settlement conversations can never "freeze" a limitations period following an extrajudicial claim and in fact cited *Fernandez Cortada* for the proposition that freezing in fact was possible but then merely held that the facts in that case did not justify such a finding.

would have been for roughly $24 million, less the credit for the approximately $2 million amount returned.  And, then, Mr. Siffert expressly confirmed in the September 18, 2019 email that Pinsky "agrees in principal (sic) to settle the matter along the lines we have discussed," *i.e.,* full payment less the credit for amount returned.[18]

These actions or statements, both separately and collectively, are acknowledgments under the three-part test laid out in *Rodriguez Narvaez*, *supra*—they were admissions of Plaintiff's specific rights, spontaneous, and made without condition (including as to the time or place of obtaining a judgment).

Defendant incorrectly contends that "'[e]fforts made and conversations had between parties regarding possible settlement, cannot be regarded as acknowledgement of a debt.'" Def. Mem. at 30, citing and quoting *Valentin-Vega v. Allstate Ins. Co.*, 2011 WL 1843156 (D.P.R.). In *Valentin-Vega*, however, the court relied on the Supreme Court of Puerto Rico's opinion in *Diaz de Diana v. AJAS Ins. Co.*, 1980 JTS 95, 110 DPR 471 WL 138494 (PR), 10 PR Offic. Trans. 602 (1980), for that proposition.[19]  And although *Diaz de Diana* did preclude acknowledgment based on settlement conversations alone, it did not preclude acknowledgment based on actual admissions or on acts which amount to admissions; rather, it simply noted that, in that specific case, "at no time [did] plaintiffs or their lawyers [make] an admission equivalent to an acknowledgment of responsibility."  *Diaz de Diana, supra*, 110 DPR at 483.[20]

---

[18] If the Court deems it necessary, Plaintiff will amend the FAC to add these additional factual allegations.

[19] *Rodriguez Narvaez, supra,* 895 F.2d. at 45 n.12, which Defendant also cites for this proposition, Def. Mem at 30, also is based solely on *Diaz de Diana*.

[20] Payments, partial or otherwise or made in the midst of settlement efforts, can constitute acknowledgments depending upon how the payment is made and on what is said and done when it is being made.  In *Valentin-Vega*, the plaintiff actually rejected a $500 payment, which in itself demonstrated that the payment was not an acknowledgment of the actual debt.

The present case is manifestly different.  In February 2019, Defendant through his counsel handed over roughly $2 million, in the form of cryptocurrency, $128,000 in cash (that was in fact stored in his bedroom), and a Patek Philippe watch he had purchased using proceeds traceable to the theft.  This was done without any conditions, *i.e.,* it was not part of any settlement communication.  In May 2019, his attorneys disclosed the wallet addresses from which Mr. Terpin's cryptocurrency had been stolen, and in June 2019, Mr. Siffert spontaneously promised a "judgment . . . anytime."  By unconditionally returning the cryptocurrency, cash, and watch; by disclosing the wallet addresses; and by spontaneously promising a judgment at any time, Defendant acknowledged responsibility for Plaintiff's $24 million loss, all of which was followed by the written assurance on September 18, 2019 to ensure that the action was not filed that there was an agreement in principle.

C.    Plaintiff's Replevin Claim Accrued In New York And Otherwise Cannot Be Dismissed.

Plaintiff's Fourth Claim for Relief—for Replevin—incorporates all of the allegations in the paragraphs previously stated, including the allegations in paragraphs 38, 45 and 47 setting forth the theft of the Triggers, Skycoin, and Steem, the allegations in paragraph 50 that "almost all" (but, thus, not "all") of the stolen Triggers were laundered, and the allegations in paragraph 55 that Defendants had difficulty laundering the Skycoin.  Plaintiff then further alleges that he was and remains entitled to "immediate and exclusive possession" of that property (FAC ¶¶ 112, 115), and that neither Defendant nor any other members of the Enterprise or other defendants have returned it to him (FAC ¶ 114).

Defendant first asserts that the claim accrues outside New York because it "does not involve specific physical property," Def. Mem. at 33, and thus must be treated like the other common law claims as solely being for economic injury and subject to the borrowing statute.

Defendant then asserts that the claim has expired for the same reasons the other common law claims have expired.  Def. Mem. at 26ff.  Second, Defendant asserts that the claim must be dismissed because the FAC does not allege that any identifiable property is in Defendant's possession and that, in any case, "ordinary currency, as a rule, is not subject to replevin."  *Id*. at 32-33 (citing cases).

Defendant is wrong on both counts, and in any event, Defendant's arguments raise factual issues that cannot be decided without proper development of the record.  The FAC specifically identifies Plaintiff's personal property in the form of cryptocurrency—Triggers, Steem, and Skycoin (and the amounts of each)—that were stolen. *In re Estate of McLaughlin*, 78 A.D.3d 1304, 1306 (3d Dep't 2010).  In actions for replevin in such a case, "the injury asserted is not purely economic" and occurs where the defendant "refused to hand over the property." *Id*. If, as here, that refusal occurs in New York where Pinsky is located, the claim for replevin accrues in New York and the borrowing statute does not apply. *Id*.

While Defendant cites authority that replevin is not available as to "ordinary currency," cryptocurrency is not "ordinary currency."  It does not come in the form of physical bills or coins.  Funds instead are transferred through an encrypted and decentralized public ledger called "blockchain," which records transactions.  FAC ¶ 23.  There are thus circumstances in which cryptocurrency can be traced in a manner that makes it different from "ordinary currency." Further there is no allegation in this case that there was commingling of the cryptocurrency. Moreover, Plaintiff alleges that "almost all" of the Triggers were moved from Binance which is not the same as Defendant's assertion that all the proceeds were moved.

Plaintiff has alleged in Paragraph 51 that he does not have access to the specific details of these transactions and that such information is in the possession of Defendants and Binance.  The Court should not address these issues before a proper and appropriate development of the record.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Motion should be denied, or, in the alternative, Plaintiff should be granted leave to amend.

DATED:  October 16, 2020                           CHEHEBAR DEVENEY & PHILLIPS

and

GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP


By: /s/ _____
         CORNELIUS P. McCARTHY


By: /s/ _____
         PIERCE O'DONNELL

         Attorneys for Plaintiff
         MICHAEL TERPIN