```
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------x
3  MICHAEL TERPIN,

4                          Plaintiff,

5                                    20-CV-3557 (CS)
       -vs-
6                                    BENCH RULING

7  ELLIS PINSKY, et al.,

8                          Defendants.
   ------------------------------------x
9
                               United States Courthouse
10                             White Plains, New York

11                             Monday, August 30, 2021
                               10:45 a.m.
12

13 B e f o r e:

14                             HONORABLE CATHY SEIBEL,
                               District Judge
15

16 A P P E A R A N C E S:

17
   GREENBERG GLUSKER
18     Attorneys for Plaintiff
   BY:  PAUL A. BLECHNER, ESQ.
19

20 CHEHEBAR, DEVENNEY & PHILLIPS
       Attorneys for Plaintiff
21 BY:  TIMOTHY TOOHEY, ESQ.

22
   SHER TREMONTE, LLP
23     Attorneys for Defendant
   BY:  NOAM KORATI BIALE, ESQ.,
24

25
```

1          THE DEPUTY CLERK:  Judge, this matter is Terpin v.

2   Pinsky.  We have on the line representing Plaintiff Mr. Paul

3   Blechner and Mr. Patrick McCarthy, and representing Defendant,

4   we have Mr. Noam Biale.  Our court reporter, Tabitha, is on and

5   Ryan is on.

6          THE COURT:  All right, good morning, everyone.

7          Let me remind the lawyers, if you say anything, the

8   first word out of your mouth should be your last name.  Please

9   do not say "this is Paul Blechner for Plaintiff," just say

10  Blechner.  Don't worry about sounding impolite or anything.  The

11  court reporter needs to know right up front who is speaking and

12  so do I, so, please, remember to say your last name first.  If

13  you forget, we're probably going to have to interrupt you and,

14  of course, we don't want that.

15         Does either side have anything to add on the motion to

16  dismiss that is not covered by the papers?  All right, I'll take

17  that as a no.

18         MR. BLECHNER:  Paul Blechner, your Honor.

19         THE COURT:  Go ahead.

20         MR. BLECHNER:  I guess -- it was unclear entirely what

21  the process was today and if you were going to allow any

22  argument.  If there are issues on which you presently intend to

23  grant the motion to dismiss that come out of the reply brief, I

24  would, I would ask for a brief opportunity to address them.  I

25  don't --

Bench Ruling                    Terpin v. Pinsky                    3

```
 1          THE COURT:  I don't do it that way.  I don't tell you
 2  how I plan to rule.  If there's anything you want to say that
 3  isn't covered by the papers, go right ahead.
 4          MR. BLECHNER:  All right, thank you, Your Honor.
 5          Look, I guess -- I want to keep it brief, but I don't
 6  want to unnecessarily use any time that isn't necessary, and a
 7  lot of it is covered, but as I've been through the reply brief,
 8  you know, it strikes me that there is an effort to create a
 9  standard that doesn't apply in this case, in multiple respects.
10          With respect to the RICO claim, the Defendant
11  repeatedly is referring to and speaking about 9(b), and the law
12  is clear that 9(b), while it has some application, it may have
13  some application in RICO claims, it does not apply to all
14  allegations in all RICO claims, and what the courts have done in
15  addressing, I think, what is an inherent tension between the
16  liberality of pleading in RICO claims and a concern about RICO
17  claims being misused in dressing up what I think are being
18  referred to as run-of-the-mill fraud claims, the courts have
19  addressed and dealt with that tension and focused on fraud
20  allegations.
21          And I think the key point here, among them certainly,
22  is that there are multiple predicate acts that have been alleged
23  as part of this association-in-fact enterprise, and those
24  multiple predicate acts include more than just wire fraud.  It
25  includes money laundering, it includes aggravated money theft,
```

1  it includes extortion and grand larceny under the New York Penal

2  Law.  And 9(b) does not apply across the board to all of those

3  allegations, and I think for that reason in particular, there's

4  a disconnect in the Defendant's efforts to hold the Plaintiff to

5  a higher level of pleading.

6          Even if 9(b) applies, the law is also clear

7  that...that information-and-belief pleading is permitted with

8  respect to allegations when those allegations are peculiarly in

9  the Defendant's knowledge, and in this case, I think we have

10 done several things in the complaint, which is, as I'm sure your

11 Honor is familiar, is extremely lengthy, goes through in great

12 detail the allegations with respect to what happened with Mr.

13 Terpin and alleges also that there were numerous other victims

14 going back for a period of multiple years, and when we look at,

15 and when we look at those allegations, those allegations are

16 supported by the assertions that the Defendant and others who

17 are part of this have made allegations about having sums of

18 money that cannot be explained solely from Mr. Terpin's theft.

19         So this is not a case where we are bootstrapping and

20 we are simply saying this happened now, it might have happened

21 before.  The allegations are that this happened to Mr. Terpin,

22 and we've explained in great detail, including dates, including

23 persons, how it happened, but that there are also separate

24 allegations to explain why we believe it happened at other times

25 and we have done the best that we can do to identify those

1  earlier incidents and talk about those victims, and that is

2  information, those victims is information, that is peculiarly in

3  the knowledge of the Defendant.  Indeed, I'm not sure how we can

4  be expected to have identified those victims.  Those victims

5  themselves may well not know who stole from them and how it

6  happened.  They obviously know that something happened, but even

7  they are likely unaware that the enterprise is the enterprise

8  that did this to them.

9          And I think for all of those reasons, when you've got

10  allegations that we've included that Mr. Pinsky, for example,

11  has over a hundred million dollars, there has to have been other

12  victims, and we've explained, you know, why we've pled what

13  we've pled and how we did it, and it seems both appropriate and

14  reasonable to be given the opportunity now to proceed with

15  discovery to flesh that out, a task that is going to be made

16  difficult by the other allegations which is Mr. Pinsky was, was

17  directing that evidence be destroyed, so we have a task ahead of

18  us that is going to need to -- that needs to be taken on and

19  that we need the opportunity to proceed with.

20          I think the other point that's critical and important

21  when considering these RICO claims is that in sifting through

22  the legal standard, the Court has focused on, again, whether it

23  may be a run-of-the-mill fraud claim that's dressed up or

24  whether, as here, we are dealing with inherently unlawful

25  activity, and this is not, this is not a case like Aranov where

1  you're dealing with an entity, where you're dealing with an

2  entity that is a business.  This was set up --

3          THE COURT:  I've got you.  Now you're -- I don't mean

4  to cut you off, but, you know, you're arguing things that I

5  think are well covered by the papers.  I wanted to give you a

6  chance to reply to anything in the reply brief because you

7  haven't had a chance to do that.

8          Mr. Biale, do you want to respond to anything that Mr.

9  Blechner says that was not part of your papers?

10          MR. BIALE:  I think that the issues are well covered

11  in the papers, you know, your Honor is well familiar with the

12  legal standard, so we rest on our prior submissions.

13          THE COURT:  All right, let me tell you where I come

14  out, and you should be prepared to either order the transcript

15  or take detailed notes because this really will govern how we go

16  forward.

17          It's a motion by the Defendant, Ellis Pinsky, to

18  dismiss Plaintiff's First Amended Complaint, which is docket

19  entry 38 -- actually, maybe it's 37.  Yeah, it's 37.  Which I'm

20  going to call the FAC.

21          I accept as true for purposes of the motion the facts,

22  although not the conclusions, set forth in the FAC.  I know the

23  parties are familiar with those facts; I'm not going to restate

24  them.

25          Procedurally, the background is the initial complaint

1  was filed on May 7th of last year.  On July 30th, the Defendant

2  requested a pre-motion conference which we held in August.  I

3  granted leave to amend.  The FAC was filed on October 15th.

4        I won't take the time to recite the plausibility

5  standard that governs Rule 12(b)(6) motions.  We're all familiar

6  with *Ashcroft v. Iqbal,* 556 U.S. 622, and *Bell Atlantic v.*

7  *Twombly*, 550 U.S. 544.

8        I do want to put point out that the *Twombly/Iqbal*

9  plausibility standard "does not prevent a plaintiff from

10  pleading facts alleged upon information and belief where the

11  facts are peculiarly within the possession and control of the

12  defendant or where the belief is based on factual information

13  that makes the inference of culpability plausible." *Arista*

14  *Records v. Doe*, 604 F.3d 110, 120.  Pleading on the basis of

15  information and belief is generally okay and can be desirable

16  and essential when matters that are necessary to complete the

17  statement of the claim are not within the knowledge of the

18  plaintiff.  *Boykin v. KeyCorp,* 521 F.3d 202, 215; *See Shulman v.*

19  *Chaitman,* 392 F.Supp.3d 340, 353, S.D. 2019, and volume 5 of

20  *Wright On Federal Practice & Procedure* § 1224, 3d ed., November

21  2018 update.

22        (Off-the-record discussion)

23        THE COURT:  While *Twombly* and *Iqbal* require "factual

24  amplification where needed to render a claim plausible," the

25  Second Circuit "rejects the contention that *Twombly* and *Iqbal*

1  requires the pleading of specific evidence or extra facts beyond

2  what is needed to make the claim plausible." *Arista Records,*

3  604, 120-21.

4        When a complaint alleges fraud, Federal Rule of Civil

5  Procedure 9(b) mandates that the complaint must state with

6  particularity the circumstances constituting the fraud and these

7  allegations ordinarily cannot be pled on information and belief.

8  *Segal v. Gordon,* 467 F.2d 602, 608.  Nevertheless, this pleading

9  restriction can be relaxed where the matter alleged is

10 peculiarly within the knowledge of the defendant, so long as the

11 fraud allegations are accompanied by a statement of facts on

12 which the belief is founded.  *Watts v. Jackson Hewitt,* 579

13 F.Supp.2d 334, 351, E.D. 2008, collecting cases.  *See DiVittorio*

14 *v. Equidyne,* 822 F.2d 1242, 1247, which is a pre-*Iqbal* and

15 *Twombly* case, but the principles still apply.

16        In deciding a motion to dismiss, I can consider,

17 obviously, the facts alleged in the complaint and any documents

18 attached to it or incorporated in it by reference, any document

19 integral to the complaint and relied on in it, information in

20 motion papers if the plaintiff relied on that information in

21 framing the complaint, and any facts of which I can take

22 judicial notice under Rule 201 of the Rules of Evidence.  *Weiss*

23 *v. Ind. Vill. of Sag Harbor,* 762 F.Supp.2d 560, 567, E.D. 2011.

24        I'm going to start with the RICO claim.

25        The civil RICO statute makes it unlawful for any

1  person employed by or associated with any enterprise engaged in

2  or the activities of which affect interstate or foreign commerce

3  to conduct or participate, directly or indirectly, in the

4  conduct of such enterprise's affairs through a pattern of

5  racketeering activity...18 U.S.C. § 1962(c).  To survive a

6  motion to dismiss, Plaintiff is required to plead, one, a

7  violation of Section 1962; two, an injury to business or

8  property; and, three, that the injury was caused by the 1962

9  violation.  *Kim v. Kimm,* 884 F.3d 98, 103.  To establish the

10 violation of 1962, the Plaintiff must plausibly allege conduct

11 of an enterprise through a pattern of racketeering activity.

12 The Defendant argues that the Plaintiff has failed to plausibly

13 allege the existence of an enterprise or of a pattern.

14          I'll start with the enterprise element.

15          "A RICO enterprise is a group of persons associated

16 together for a common purpose of engaging in a course of

17 conduct, the existence of which is proven by evidence of an

18 ongoing organization, formal or informal, and by evidence that

19 the various associates function as a continuing unit."

20 *U1it4less, Inc. v. Fedex,* 871 F.3d 199, 205, note 8.  The term

21 "enterprise" includes any individual, partnership, corporation,

22 association, or other legal entity, and any union or group of

23 individuals associated in fact, although not a legal entity.

24 That's the definition from Section 1961(4).

25          Where a complaint alleges an association-in-fact

enterprise, such as alleged by Plaintiff here, a court should examine the "hierarchy, organization, and activities" of the association to determine whether "its members functioned as a unit." *First Capital Asset Management v. Satinwood*, 385 F.3d 159, 174-75; *See McGee v. State Farm,* 2009 WL 2132439, at page 4, note 7, E.D. July 10, 2009, which noted the low threshold for pleading such an enterprise.  The existence of an association-in-fact is often times more readily proven by what it does as opposed to abstract analysis of its structure. *United States v. Applin,* 637 F.3d 59, 73.  Accordingly, proof of various racketeering acts may be relied on to establish the existence of the enterprise.  Again, *Applin*, 73.  Thus, although the existence of the enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other, the existence of an association-in-fact can be inferred from the evidence showing the persons associated with the enterprise engaged in a pattern of racketeering activity, and the evidence used to prove the pattern of racketeering activity and the evidence establishing the enterprise may, in particular cases, coalesce.  *Boyle v. United States,* 556 U.S. 938, 947.

I note that Defendant's association to *Boyle* is misleading.  Defendant cites *Boyle* for the proposition that its enterprise must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it

1  engages, that's in the Defendant's reply brief at page 9, but

2  *Boyle*, while holding that an enterprise has to have a structure,

3  rejected any requirement that the jury be informed that the

4  structure had to be anything beyond that inherent in the

5  pattern, see 556 U.S., 946-47.

6           To allege a RICO association-in-fact, the Plaintiff is

7  required to adequately plead only three structural features:

8  one, a shared purpose; two, relationships among the associates;

9  and three, longevity sufficient to permit these associates to

10 pursue the enterprise's purpose.  *D'Addario v. D'Addario,* 901

11 F.3d 180, 100.

12          Starting with the first requirement, the enterprise

13 has to share a common purpose to engage in a particular

14 fraudulent course of conduct and to work together to achieve

15 such a purpose.  *First Capital,* 385 F.3d, 174.  There is clear

16 Second Circuit precedent which allows an enterprise to be

17 comprised of a group formed for the sole purpose of engaging in

18 fraudulent activity.  *Feinberg v. Katz,* 2002 WL 1751135, at page

19 12, S.D. July 26, 2002.  Here, Plaintiff plausibly alleges that

20 the alleged enterprise had such a purpose, stealing and

21 laundering large cryptocurrency holdings.  See, for example,

22 paragraphs 1, 4, 6, 28, 37, 52-55, and 86 of the FAC.  Defendant

23 does not seriously dispute this aspect of pleading an

24 enterprise.

25          Next, an association-in-fact needs only to have

1  relationships among its associates.  It "need not have a

2  hierarchical structure or chain of command, decisions may be

3  made on an ad hoc basis, and on any number of methods...members

4  of the group need not have fixed roles, different members may

5  perform different roles at different times.  The group need not

6  have a name, regular meetings, dues, established rules and rules

7  and regulations, disciplinary procedures, or induction or

8  initiation ceremonies."  That's *Boyle*, 556 U.S., 948.

9  Accordingly, an association-in-fact enterprise does not require

10 any relationship among the individuals apart from their

11 participation in the affairs of the enterprise as long as facts

12 are alleged tending to make it plausible that the Court is

13 confronted with something more than parallel conduct of the same

14 nature and in the same time frame by different actors in

15 different locations.  *Elsevier Inc. v. W.H.P.R.*, 692 F.Supp.2d

16 297, 306-07, S.D. 2010.

17         Here, Plaintiff alleges that "a group of young video

18 game players" from the U.S. and Britain, which included Pinsky,

19 Truglia, Accomplices A, B, and C, and Individual X, formed an

20 enterprise in an online user group called "Original Gangsters"

21 or "OGUsers."  That's paragraph 37.  The FAC also offers

22 specific allegations based on information from Individual X that

23 the members would communicate through Twitter.  That's in

24 paragraph 70.  Each of the dozen or more members of the

25 enterprise all had particular assigned roles as they allegedly

1  participated in numerous SIM swaps, hacks, and other schemes in

2  furtherance of their fraudulent purpose of stealing and

3  laundering cryptocurrencies.  Specifically, those roles are

4  alleged to include "identifying the victims, obtaining their

5  cell phone and passcode numbers, impersonating and stealing the

6  identity of the victims, conning or bribing mobile phone

7  carriers' employees into giving the imposter a new SIM card, and

8  handing off the personal identity information to the other

9  members of the enterprise who executed the hack and laundered

10 the cryptocurrency holdings into Bitcoins or fiat money in

11 accounts under their own control that could be transferred to

12 anonymous wallets."  That's paragraph 30.  To bolster this

13 allegation, Plaintiff pleads with particularity the specific

14 roles played by each individual in the theft of his own

15 cryptocurrency via a SIM swap.  See paragraph 38.  He includes

16 specific factual allegations about how Truglia, in statements to

17 Chris David, described Pinsky recruiting disgruntled employees

18 of mobile carriers to assist in SIM hacks and describes with

19 particularity how Pinsky, Truglia, and other members of the

20 enterprise split up the illicit proceeds from the theft of

21 Plaintiff's cryptocurrency.  See paragraphs 58, 60, 63, 76-77.

22         While the FAC's allegations as to how the members of

23 the enterprise had specific roles in other hacks and schemes are

24 far more general and many of Plaintiff's claims regarding these

25 hacks and schemes are based on information and belief, I find

1  that these allegations nevertheless satisfy the plausibility

2  standard because, one, any facts concerning other schemes and

3  the exact origins of and roles within the enterprise would be

4  peculiarly within the knowledge of Defendant, and, two,

5  Plaintiff provides a factual basis for these assertions.  In

6  addition to the details of the SIM swap of which Plaintiff

7  himself was a victim, he relies on numerous admissions and

8  statements from Pinsky, Truglia, and their associates, as well

9  as evidence of the values of Pinsky's and Truglia's

10 cryptocurrency portfolios which far exceeded the $24 million in

11 cryptocurrency Plaintiff alleges the enterprise stole from him.

12 While it's conceivable that these other hacks by Pinsky and

13 Truglia were not part of the activity of the enterprise, it is

14 plausible that they were.

15         Plaintiff explains how, based on Plaintiff's

16 investigations, including information from what he describes as

17 several informants, including Individual X who is a former

18 accomplice by Pinsky, and statements made by Pinsky and Truglia

19 to other informants, that's in ¶ 5, he came to believe that

20 these individuals knew each other and coordinated their schemes

21 on the OGUsers forum, and based on these conversations and the

22 roles of each member of the enterprise in his own SIM swap, he

23 alleges that each individual's unique skill set was needed to

24 pull off their crimes with the various pieces working together

25 in concert.  Compare *Elsevier,* 692 F.Supp.2d, 307, where the

1  court noted that an association requires proof of interpersonal

2  relationships, and nothing in the complaint explained how the

3  particular defendants in different parts of the country came to

4  an agreement to act together or even how they knew each other.

5  Contrary to Defendant's argument, the FAC does not merely rely

6  on boilerplate allegations of a relationship among individuals.

7  Instead, it details the roles of the enterprise members in the

8  only hack Plaintiff could reasonably have intimate knowledge of,

9  his own, and provides a detailed explanation of the enterprise's

10 *modus operandi* in that scheme.  See FAC paragraphs 38-56, 61-68,

11 76, 91-94.  Plaintiff also includes a specific allegation of at

12 least one other hack perpetrated by the enterprise where "one

13 victim lost all the money set aside for his daughter's college

14 education."  That's paragraph 12.  Plaintiff also alleges

15 another apparently much larger hack in paragraph 77, but it is

16 only alleged that Defendant participated in it.  It is not

17 alleged to be the work of the enterprise.  But extrapolating

18 from Plaintiff's own experience, coupled with the admissions of

19 Pinsky and Truglia and information received from the informants,

20 Plaintiff plausibly alleges that, sort of like Danny Ocean and

21 Rusty Ryan organized a diverse set of criminals to pull off a

22 grand casino heist in the *Ocean 11* franchise, Pinsky, Truglia,

23 and their associates organized a criminal enterprise of

24 individuals with the specific skills necessary to conduct

25 large-scale heists of cryptocurrency using computers.  See

1  paragraphs 38-77.  *See Barker v. Rokosz,* 2021 WL 1062246, at

2  *9-10, E.D. March 18th, 2021, which found a complaint to

3  properly plead the relationship requirement where it identifies

4  the role of each defendant and the linkages among them; *Cf.*

5  *Boyle*, 556 U.S., 947, page 4, which noted where individuals

6  independently and without coordination engaged in a pattern of

7  predicates that would not be enough to show an enterprise.

8         As for the third requirement, an enterprise must have

9  some longevity, since the offense prohibited by the RICO statute

10 demands proof that the enterprise had affairs of sufficient

11 duration to permit an associate to participate in those affairs

12 through a pattern of racketeering activity.  *Gucci America*

13 *versus Alibaba Group,* 2016 WL 6110565, at page 5, S.D., August

14 4th, 2016.  "While the group must function as a continuing unit

15 and remain in existence long enough to pursue a course of

16 conduct...nothing in RICO exempts an enterprise whose associates

17 engage in spurts of activity punctuated by periods of

18 quiescence." *Boyle*, 948.  While Defendant's memorandum points

19 to several cases where RICO enterprises were alleged to exist

20 for several years, he points to no authority for the proposition

21 that such a stretch is necessary for longevity.  That's at

22 paragraph 11.  Here, Plaintiff sufficiently pleads longevity by,

23 as discussed above, alleging on information and belief, based on

24 circumstantial and direct evidence, that the enterprise operated

25 both before the hack of Plaintiff, that is, beginning in 2015,

1  and most likely after, up until the time Truglia was charged and

2  identified Pinsky as his accomplice.  See FAC paragraphs 53, 56,

3  61-63, 65, 76-77, and 91-94.  For example, according to

4  paragraph 63, Truglia admitted to multiple hacks and described

5  Defendant as his partner with whom he had done hacks the same

6  way they had hacked Plaintiff.  Defendant has said that he has

7  been stealing cryptocurrency since he was thirteen years old,

8  according to paragraph 65.  In January 2019, a year after

9  Plaintiff was hacked and days after his lawyers had presented a

10 draft complaint to Defendant's lawyers, Accomplice C told

11 Individual X "it's about to be over," suggesting not only that

12 those two were part of Plaintiff's enterprise, but that "it" had

13 been ongoing until that point.  This period is of sufficient

14 duration to permit an associate to participant in a pattern of

15 racketeering activity.  *Gucci America* at page 5.  It may turn

16 out that the enterprise conducted only Plaintiff's hack, in

17 which case the few days in January 2018 would not suffice in all

18 likelihood for longevity, but for now, Plaintiff plausibly

19 alleges an enterprise of sufficient duration, so the

20 requirements for pleading an enterprise are met.

21         Now, turning to the pattern...

22         To plead a pattern of racketeering activity, the

23 plaintiffs must plausibly allege that the predicate acts are

24 related and amount to or pose a threat of continued criminal

25 activity.  *H.J. Inc. v. Northwest Bell*, 492 U.S. 229, 237-39.

1  These requirements are known as relatedness and continuity.

2  *Pier Connection v. Lakhani,* 907 F. Supp. 72, 75, S.D. 1995.

3  Defendant does not seem to challenge that the FAC's alleged

4  predicate acts are related, but argues that Plaintiff has failed

5  to sufficiently allege continuity.  See Defendant's brief at

6  pages 13-15.  That's docket entry 39 by the way.

7          The continuity element can be close-ended or

8  open-ended, *See AmBase Corp. v. 111 W. 57th*, 785 F. App'x 866,

9  888, and the Defendant argues that the FAC's allegations do not

10 satisfy the standard for either one.

11         Close-ended continuity refers to criminal activity

12 stretching over a substantial period of time, generally at least

13 two years, regardless of whether it will continue into the

14 future, *AmBase*, 888.  "To satisfy close-ended continuity, the

15 plaintiff must prove a series of related predicates extending

16 over a substantial period of time." *Grace Int'l Assembly of God*

17 *v. Festa*, 79 F. App'x 603, 506, *cert denied*, 141 S. Ct. 358.

18 Since 1989, the Second Circuit has never found predicate acts

19 spanning less than two years to be sufficient to constitute

20 close-ended continuity.  *Spool v. World Child Int'l Adoption*

21 *Agency*, 520 F.3d 178, 184, a 2008 case, so in that almost

22 twenty-year period.  *Spool* explains that the relevant period the

23 court should examine for making the determination of close-ended

24 continuity is the time during which the RICO predicate activity

25 occurred, not the time during which the underlying scheme

1 operated or the underlying dispute took place.  Additionally,

2 while two years may be the minimum duration to find close-ended

3 continuity, the mere fact that the predicate acts spanned two

4 years is insufficient without more to support a finding of a

5 close-ended pattern.  *First Capital*, 181.  The court has to also

6 consider the number and variety of predicate acts, the presence

7 or absence of multiple schemes, and the number of participants

8 and victims to evaluate whether the pattern was continuing.

9 *Spool,* 520 F.3d, 184.

10        Here, while the FAC alleges that the enterprise

11 engaged in predicate acts of wire fraud, money laundering,

12 aggravated identity theft, extortion, and grand larceny, the

13 specific and detailed factual allegations underlying those

14 claims all occurred in 2018, spanning a period of a few months

15 as opposed to the minimum period of two years.  See FAC

16 paragraphs 9 and 38.  While Plaintiff alleges that the

17 enterprise has been in existence since at least 2015, the

18 relevant window for purposes of close-ended continuity is the

19 time during which the predicate activity occurred, according to

20 *Spool,* 184.  No predicates relating to hacks other than

21 Plaintiff's are pleaded with the specificity required by Rule

22 9(b).  Accordingly, Plaintiff has not met the pleading standard

23 for close-ended continuity.

24        I acknowledge that only the fraud hacks have to be

25 pleaded with the specificity required by Rule 9(b), but there

1 are simply no predicates of any sort pleaded sufficiently other

2 than Plaintiff under the plausibility standard, so I find the

3 Plaintiff has not met the pleading standard for close-ended

4 continuity.

5        Open-ended continuity can be shown two ways.  One is

6 by showing that the enterprise primarily conducts a legitimate

7 business, but there is some evidence from which it may be

8 inferred that the predicate acts were the regular way of

9 operating the business or that the nature of the predicate acts

10 themselves implies a threat of continued criminal activity.

11 *Grace Int'l*, 606.  That does not apply here.  Open-ended

12 continuity can also be shown where the acts of a defendant or

13 the enterprise are inherently unlawful, such as murder or

14 obstruction of justice, and are in pursuit of inherently

15 unlawful goals such as narcotics trafficking or embezzlement;

16 same case, 606.  The hacking activity alleged here is akin to

17 embezzlement, so this type of continuity applies here.

18        "A threat of continuity exists...where the acts form

19 part of a long-term association that exists for criminal

20 purposes."  *U.S. v. Aulicino,* 44 F.3d 1102, 1111.  For example,

21 the Second Circuit has found, without discussing the specific

22 period of time involved, that "numerous activities involving

23 bribery and money laundering on behalf of organized crime" which

24 were "part of a consistent pattern that was likely to continue

25 for the indefinite future absent outside intervention" was "more

1  than ample to establish...continuity." *U.S. v. Coiro,* 922 F.2d

2  1008, 1017.  In so doing, the court held that "where the

3  enterprise is an entity whose business is racketeering activity,

4  an act performed in furtherance of that business automatically

5  carries with it the threat of continued racketeering activity.

6          Here, like *Aulicino* and *Coiro*, the predicate acts

7  themselves imply a threat of continued criminal activity and the

8  purpose of the enterprise was one that was inherently unlawful,

9  theft and laundering of large amounts of cryptocurrency.

10 *Kalimantano GmbH v. Motion in Time,* 939 F.Supp.2d 392, 407,

11 S.D.N.Y. 2013.  Indeed, "an inherently unlawful act performed on

12 behalf of an enterprise whose business is racketeering activity

13 would automatically give rise to the requisite threat of

14 continuity." *Eagle One Roofing Contractors v. Acquafredda*, 2018

15 WL 1701939, at page 13, S.D., March 31, 2018.  This may be true

16 even though the racketeering acts occurred over a short time

17 period.  *Kalimantano*, 407.  This is distinct from schemes where

18 the alleged racketeering activity was in connection with

19 businesses or endeavors that are not inherently unlawful, where

20 courts generally have not found a threat of continuing activity

21 arising from the nature of conduct alone, even if it extended

22 over longer periods.  *Kalimantano*, 407.  As noted earlier,

23 Plaintiff has sufficiently, maybe barely, pleaded enough to give

24 rise to a reasonable inference that the enterprise "was an

25 ongoing one that would, absent discovery of the...fraud, have

1  continued to engage in criminal activity." *International*

2  *Brotherhood of Teamsters v. Carey*, 297 F.Supp.2d 706, 712 and

3  716, S.D. 2004, so I find open-ended continuity is plausibly

4  pleaded.

5          It, of course, may ultimately turn out, after

6  discovery, that the alleged enterprise only engaged in the SIM

7  swaps targeting Plaintiff or in a limited number of them against

8  a specifically-identified set of victims with large crypto

9  holdings and thereafter disbanded.  At this early stage,

10 however, I find the Plaintiff has satisfied the pleading

11 requirements for a civil RICO claim, so that claim is going to

12 go forward.

13         Now I'm going to turn to the common-law claims, and

14 I'll first address the statute of limitations.

15         Defendant argues that the claims for replevin,

16 conversion, and money had and received must be dismissed as time

17 barred.  He says that under New York Law, Plaintiffs claim

18 necessarily arose in Puerto Rico and thus is required to be

19 timely under Puerto Rico's one-year statute of limitations.

20 That's in their brief at page 26.  *See Barreto Peat v. Luis*

21 *Ayala Colon*, 709 F. Supp. 321, 323, D.P.R. 1989, discussing 31

22 L.P.R.A. § 5298, which is that one-year statute.  While

23 Plaintiff's state law claims may very well be time barred, I

24 think it is too early to tell if dismissal on that ground is

25 appropriate absent further factual development for reasons I

1    will now explain.

2         The statute of limitations argument on a motion to

3    dismiss will succeed only if it is apparent from the face of the

4    complaint that the claim is time barred.  *See e.g. Harris v.*

5    *City of New York*, 186 F.3d 243, 250.  That might be F.2d; I'm

6    not sure.  "Generally, because Defendants have the burden of

7    raising an affirmative defense in their answer and establishing

8    it at trial or on a motion for summary judgment, a plaintiff, in

9    order to state a claim, need not plead facts showing the absence

10   of such a defense."  *Reach Music v. Warner/Chappell Music,* 2009

11   WL 3496115, at page 2, S.D., October 23rd, 2009.  It, therefore,

12   follows that unless a complaint alleges facts that create an

13   ironclad defense, a limitations argument must await factual

14   development.  *Allen v. Dairy Farmers of America,* 748 F.Supp.2d

15   323, 353-54, Dist. Of Vermont 2020.  *See Weisman, Celler, Spett*

16   *& Modlin v. Trans-Lux*, 2013 WL 2190071, at page 2, S.D. May 21,

17   2013, which noted that a question of fact as to whether the

18   statute of limitations was tolled is all that's required to

19   defeat a motion to dismiss.

20        When somebody who is not a resident of New York sues

21   on a cause of action accruing outside New York, New York CPLR §

22   202 requires that the cause of action be timely under the

23   limitation periods of both New York and the jurisdiction where

24   the cause of action accrued.  *Global Fin. Corp. V. Triarc,* 93

25   N.Y.2d 525, 529.  "The practical import of § 202 is that it

1  requires non-resident plaintiffs to file claims by the shorter

2  of the statute of limitations of either, A, New York, or, B, the

3  jurisdiction where the claim accrued (in order to prevent forum

4  shopping by time-barred claimants)." *2002 Lawrence R.*

5  *Buckhalter Alaska Trust v. Philadelphia Financial Life,* 96

6  F.Supp.3d 182, 201, S.D. 2015.  The FAC does not allege that

7  Plaintiff is a resident of New York and so I have to examine

8  where his cause of action accrued.

9           A cause of action accrues at the time and in the place

10 of the injury.  *Deutsche Bank v. Barclays Bank,* 34 N.Y.3d 327,

11 336, and when that injury is purely economic, the place of

12 injury usually is where the plaintiff resides and sustains the

13 economic impact of the loss.  *Global Financial,* 93 N.Y.2d, 529,

14 collecting cases.

15          As I'll get to below when I talk about replevin, the

16 injury here may not be purely economic if one regards the

17 cryptocurrency as personal property.  I see no reason, however,

18 why the analysis of where the Plaintiff was injured, in other

19 words, where his cryptocurrency holdings were stolen, and where

20 he felt the impact of that injury would depend on whether the

21 injury is appropriately categorized as purely economic or as a

22 theft of personal property, so the place of injury is where the

23 Plaintiff resides and sustains the economic impact, and,

24 therefore, under New York law, the claim must be timely under

25 the law of the jurisdiction where Plaintiff resides and

1  sustained the economic impact of the theft of his

2  cryptocurrency.

3          While the FAC states that Plaintiff is a resident of

4  California, Puerto Rico, and Nevada, and while the Defendant

5  concedes that under New York law a party can have more than one

6  residence, see Defendant's brief at paragraph 27, Defendant

7  argues that I should take judicial notice of a proceeding in the

8  Central District of California concerning the same incidents at

9  issue here where the court held that "Mr. Terpin is domiciled in

10 Puerto Rico and was in Puerto Rico at the time of the incident."

11 That's *Terpin v. AT&T Mobility,* 399 F.Supp.3d 1035, 1047, C.D.

12 of California 2019.  I am not going to regard that finding as

13 determinative because there is no indication where the court got

14 the latter fact and Plaintiff disputes it.

15         Additionally, Plaintiff stated in the filing made in

16 March 2020 that he is "domiciled in Puerto Rico with a residence

17 in California," see 2020 WL 1672741, with no mention of Nevada.

18 Even if I were to take visual notice of this fact, however, I do

19 not think that Defendant has satisfied its burden to show that

20 the complaint alleges facts that "create an ironclad defense."

21 *Allen,* 748 F.Supp.2d, 354.

22         That statement, and the information Defendant has

23 provided about Plaintiff bragging about how Puerto Rico is his

24 home due to the tax benefits it offers to crypto investors, if

25 true, certainly provide a strong inference that Puerto Rico is

Bench Ruling                  Terpin v. Pinsky                    26

1  where Plaintiff resides and where the economic impact of the

2  hack was felt and therefore that that is where the claim

3  accrued, but these statements are outside the complaint and do

4  not create an ironclad defense in light of Plaintiff's

5  allegation of a Nevada residence, so we need some further

6  factual development before I can definitively rule.

7          I would add that the central question of where the

8  claim accrued is not simply where Plaintiff was at the time of

9  the injury, as both parties suggest, but where he resides and

10  sustained the economic impact of the loss.  *Global Financial*,

11  529.  That is not apparent from the face of the FAC.  At this

12  stage, we know little about the location of Plaintiff's

13  financial base, and I am not going to decide based on Twitter or

14  podcast comments outside the complaint without knowing how or

15  where Plaintiff held his cryptocurrency holdings, where he paid

16  taxes, et cetera.  Absent factual development about where

17  Plaintiff's financial base is located, I can't say as a matter

18  of law that the claim accrued in Puerto Rico.  *See Lang v.*

19  *Paine, Webber*, 582 F. Supp. 1421, S.D. 1984, a case where a

20  Canadian plaintiff intentionally maintained a separate financial

21  base in Massachusetts, and under the circumstances, the injury

22  of losing the Massachusetts funds was felt in Massachusetts, not

23  in Canada where the Plaintiff resided, so the motion is denied

24  with respect to the statute-of-limitations defense.  I'm sure

25  I'll hear about it again on summary judgment, and because

1  there's a question of fact as to where the claims accrued, I

2  don't have to reach the issue of whether the Puerto Rico statute

3  of limitations should be tolled.  I'm sure I'll hear about that

4  at summary judgment again.

5          Turning to the replevin claim, replevin "is a remedy

6  employed to recover specific, identifiable items of personal

7  property.  A cause of action sounding in replevin must establish

8  that the defendant is in possession of certain property of which

9  the plaintiff claims to have a superior right."  *TAP Manutencao*

10 *v. Int'l Aerospace Group*, 127 F.Supp.3d 202, 211, S.D. 2015.

11         Defendant argues that the replevin claim must be

12 dismissed because replevin is a remedy employed to recover a

13 specific identifiable item of personal property and that

14 ordinary currency, which Defendant argues includes

15 cryptocurrency, "as a rule is not subject to replevin."  *Heckl*

16 *v. Walsh,* 96 NY Supp. 2d 413, 414, 4th Dep't 2014.  Plaintiff,

17 in contrast, argues that his cryptocurrency holdings can be

18 subject to replevin because cryptocurrency is not an "ordinary

19 currency."  He argues in his opposition memo, which is docket

20 entry 41, at page 34 that cryptocurrency does not come in the

21 form of physical bills or coins.  Funds instead are transferred

22 through an encrypted and decentralized public ledger called

23 'blockchain,' which records transactions.  There are thus

24 circumstances in which cryptocurrency can be traced in a manner

25 that makes it different from ordinary currency.  That's the end

1  of the quote from Plaintiff's brief.

2          Whether cryptocurrency tokens can be subject to

3  replevin under New York law appears to be a matter of first

4  impression.  The purpose of a replevin action is to recover

5  "chattels," which are specifically defined to include "all

6  specific personal property such as, but not limited to,

7  certificates of stock, bonds, notes, or other securities or

8  obligations."  That's Section 15 of the New York General

9  Construction Law.

10          While the Court of Appeals has not addressed the exact

11  question, the statute likely applies to shares of stock that are

12  transferred electronically, as well as physical stock

13  certificates.  *See Salonclick v. Super Ego Management*, 2017 WL

14  239379, at page 2-3, S.D. 2017, which noted a Court of Appeals

15  decision suggesting that electronic data indistinguishable from

16  printed documents can be subject to the tort of conversion

17  because it cannot be seriously disputed that society's reliance

18  on computers and electronic data is substantial, if not

19  essential, and that computers and digital information are

20  ubiquitous and pervade all aspects of business, financial, and

21  personal communication activities, so the statute likely applies

22  to electronically-transferred shares.

23          In addition, there is authority for defining

24  cryptocurrency as securities in some context, such as

25  unauthorized sales, under the Securities & Exchange Act.  *See*

1   *SEC v. Kik Interactive,* 492 F.Supp.3d 169, 176, S.D. 2020, which

2   noted that the SEC has determined that cryptocurrency tokens

3   were securities.  *SEC v. Telegram Group*, 448 F.Supp.3d 352, 379,

4   S.D. 2020, which granted a preliminary injunction to prevent the

5   planned distribution of digital tokens because there was a

6   substantial likelihood that the SEC would succeed in proving

7   that the plan constituted an unregistered securities offering.

8   And *Balestra v. ATBCOIN*, 380 F.Supp.3d 340, S.D. 2019, which

9   denied a motion to dismiss in a punitive class action, alleging

10  that a company sold unregistered securities through the offering

11  of digital tokens.

12          There is an argument that just because a sale of

13  cryptocurrency can be considered a sale of a security for

14  purposes of SEC enforcement does not necessarily mean that

15  cryptocurrency tokens are also securities in the sense of

16  specified personal property for a replevin action under New York

17  law.  Cryptocurrency tokens have some qualities in common with a

18  security, like a share of stock in a company, and some qualities

19  in common with ordinary currency, which circulates as a medium

20  of exchange, quoting from *Black's Law Dictionary, Black's Law*

21  *Dictionary*'s definition of currency from the 11th Edition in

22  2019.  As Judge Vitaliano explained in the 2019 decision,

23  cryptocurrency can be defined as just what its name suggests, an

24  encrypted digital currency.  *Pogodin v. Cryptorion,* 2019 WL

25  8165040, at page 1, note 3, E.D. May 14th, 2019, where the court

1  said "cryptocurrencies are digital currencies...that rely on

2  encryption techniques to secure and verify financial

3  transactions independent of a central issuing or regulating

4  authority."  While it is true that cryptocurrencies are "units

5  of computer code" that are "fundamentally private-sector

6  technologies," there is no doubt that they are "used as forms of

7  currency by some private individuals." *Tucker v. Chase Bank*,

8  399 F.Supp.3d 105, 108, S.D. 2019.  Cryptocurrency tokens thus

9  "clearly qualify as money or funds under...their plain meaning

10 definition" and "can be easily purchased in exchange for

11 ordinary currency, acts as a denominator of value and are used

12 to conduct financial transactions." *U.S. v. Faiella*, 39

13 F.Supp.3d 544, 545, S.D. 2014.  *See SEC v. Telegram Group*, 448

14 F.Supp.3d 352, 358.  It said "cryptocurrencies (sometimes called

15 tokens or digital assets) are a lawful means of storing or

16 transferring value."  On the other hand, as noted earlier,

17 cryptocurrency is also an investment vehicle that rises and

18 falls in value on grounds other than efforts by the holder.

19       Ultimately I do not think the question of whether

20 cryptocurrency can be the subject of a replevin action requires

21 that it be considered a security and not currency because even

22 if it is currency, such a claim, in other words, a replevin

23 claim, can be brought to recover "currencies that can be

24 specifically identified, i.e., it consists of specific

25 identifiable coins or bills." *Heckl*, 1996 N.Y.S.2d, 414.  Other

1 district courts have noted how blockchain technology, which

2 relates to how the cryptocurrency is transferred through the

3 encrypted and decentralized public ledger, that Plaintiff notes

4 in his opposition at paragraph 34 "tracks the ownership and

5 transfer of every [token] in existence" and how "every...wallet

6 and the number of [tokens] inside that particular wallet can be

7 identified on the blockchain by referring to its public key."

8 *BDI Capital LLC v. Bulbul Investments*, 446 F.Supp.3d 1127, 1137,

9 N.D. of Georgia 2020, which found Bitcoin to be specific

10 intangible personal property rather than money for purposes of a

11 conversion claim.  *Cf. Ox Labs v. Bitpay,* 2020 WL 1039012, at

12 page 6, C.D. of California, January 24th of 2020, which noted

13 that cryptocurrency is tangible property subject to the tort of

14 conversion because it "is not merely an idea that is entirely

15 divorced from any physical form.  Rather, it is dependent on

16 blockchain, a public ledger, which records all the

17 transactions."  *Kleiman v. Wright,* 2018 WL 6812914, at pages 15

18 and 16, S.D. of Florida, December 27, 2018, which found Bitcoin

19 to be identifiable enough at the motion-to-dismiss stage to be

20 eligible for a conversion action, and *Currier v. PDL Recovery*

21 *Group*, 2019 WL 4057394, at page 2, E.D. of Michigan, August

22 27th, 2018, which described cryptocurrency held on the coin base

23 platform as "intangible personal property."  Additionally, while

24 not exactly on point, the Eastern District has found

25 cryptocurrency tokens to be commodities that can be regulated by

1    the CFTC.  *CFTC v. McDonnell,* 287 F.Supp.3d 213, 228, E.D. 2018,

2    which said "virtual currencies are 'goods' exchanged in a market

3    for a uniform quality and value.  They fall well within the

4    common definition of commodity, as well as the [Commodity

5    Exchange Act]'s definition of commodities as 'all other goods

6    and articles...in which contracts for future delivery are

7    presently or in the future dealt in.'"  At least for now, I

8    agree with these courts that cryptocurrency tokens, even if

9    appropriately categorized as a currency, are sufficiently

10   concrete and identifiable that they may be the subject of a

11   replevin action.

12           Defendant nevertheless argues that Plaintiff's

13   replevin claim cannot proceed because the FAC does not allege

14   that such property is in the Defendant's possession.  That's in

15   Defendant's brief at paragraph 33.  *Cf. TAP*, 211, which said

16   that the Plaintiff has to establish that the Defendant is in

17   possession of the property to which Plaintiff claims the

18   superior right.  Plaintiff alleges in the FAC that the stolen

19   Triggers and Steem were laundered into Bitcoin and distributed,

20   but that the enterprise may have been unsuccessful in laundering

21   his Skycoin, which thus arguably may still be in Plaintiff's

22   custody or control.  See FAC paragraphs 38 and 48-55.  Whether

23   these various tokens are still in Defendant's possession,

24   however, is immaterial.

25           Under New York law "where property is wrongfully taken

1  by a person or lawfully taken and wrongfully transferred by him

2  or her to another, his or her actual or continued possession at

3  the time of the commencement of the action is not essential to

4  support such an action against him or her on behalf of the party

5  entitled to possession to recover it." *In Re Estate of*

6  *McLaughlin,* 932 N.Y.2d 188, 190, 3d Dep't 2011.  New York courts

7  have consistently held going as far back as the 19th century

8  that a defendant who has parted with property voluntarily and

9  wrongfully is not in a position to deny possession or assert

10  present non-possession as grounds for dismissal, same case, 190,

11  *Accord National Steamship Co. v. Sheehan*, 122 N.Y. 461, 464-65,

12  from 1890, and *Brockway v. Burnap*, 16 Barb. 309, 312-14, a New

13  York Supreme Court case from 1853.  Instead of dismissal, "a

14  judgment for possession in a replevin action generally includes

15  an alternative award of a money judgment in the amount of the

16  chattel's value at the time of trial, and the money judgment is

17  collected in the event that the chattel can no longer be found

18  in the defendant's possession." *Sell It Social v. Strauss,* 2018

19  WL 2357261, at page 7, S.D. March 8th, 2018.

20      Accordingly, the motion to dismiss the replevin claim

21  is denied.

22      Turning now to the claim for injunctive relief,

23  Plaintiff's opposition memorandum did not address Defendant's

24  argument in support of dismissal of Plaintiff's claims for a

25  preliminary and permanent injunction, and on that ground, the

1  claim is properly dismissed, dismissed as abandoned.  *Horsting*

2  *v. St. John's Riverside*, 2018 WL 1916617, at page 6, S.D. April

3  18th, 2018; *Johnson v. City of New York*, 2017 WL 2312924, at

4  page 17, S.D.N.Y. May 26th, 2017; *Brandon v. City of N.Y.*, 707

5  F.Supp.2d 261, 268, S.D. 2018; and *Bonilla v. Smithfield,* 909 WL

6  4457304, at page 4, S.D. December 4, 2009.

7        So in conclusion, for the foregoing reasons, the

8  motion to dismiss is granted with respect to the claim for

9  injunctive relief and it is otherwise denied.  The Clerk of

10  Court should terminate motion number 38.  And now we need to

11  talk about discovery.

12        I assume the parties have not talked about a case

13  management plan because you were awaiting this ruling, so let me

14  ask, I'll start with Plaintiff's side, what does Plaintiff think

15  is a reasonable time frame for fact discovery and expert

16  discovery.

17        MR. BLECHNER:  We haven't had discussions about this

18  for the reasons that you've noted.  I would think, though, that

19  if we, if we get started promptly, and we will, that ten to

20  twelve months would be, I think, what we would be asking for,

21  your Honor.

22        THE COURT:  Mr. Biale, what do you think?

23        MR. BIALE:  I also have not had an opportunity to

24  discuss with my colleagues or opposing Counsel this question, so

25  I think we will need to do that.  That time period sounds

1   lengthy to me.  I don't know that so much time will be required,

2   but let me confer and then I can report back.

3         I do want to let the Court know and opposing Counsel

4   know that with respect to when we get started, Mr. Tremonte and

5   I are scheduled to be on trial before Judge Gardephe in a

6   criminal matter October 6th, and so as a result, you know, we

7   are a little bit jammed up on time in the, in the -- for much of

8   the month of September, and I expect that the trial will last

9   approximately two weeks, but after that, we should be in a

10  position to, to proceed.

11        THE COURT:  All right, well, why don't we do this.

12  I'm going to ask Mr. Clark, my deputy, to e-mail you one of my

13  blank case management plans.  You two should confer, or three or

14  four, however -- both sides should confer, and see if you can

15  come to an agreement.

16        I'm sure Plaintiff's Counsel understands that when

17  you've got a trial looming, almost everything else falls by the

18  wayside, so that may be a reason why the discovery period needs

19  to be a little more stretched out than it would ordinarily if

20  you're going to be out of pocket for essentially the next...six

21  or seven weeks, but I'll let you, I'll let you folks confer on

22  that.

23        And, you know, I would rather set a realistic schedule

24  that you stick to than set an optimistic one that's going to

25  require extensions, so you guys should talk and let me give you

1  a date because you're lawyers and you need a date for

2  everything.  Why don't we say by Friday, September 3rd, you'll

3  submit a, hopefully, agreed-upon case management plan, and if

4  you can't agree, send it with a joint letter explaining your

5  dueling positions and I'll...I'll decide.

6          What about trying to resolve the case?  We can go off

7  the record for a second, although this is a public line so we're

8  -- I don't know if anybody's on it, but we are not speaking

9  privately.

10          (Off-the-record discussion)

11          THE COURT:  All right, anything else we should do this

12  morning?

13          MR. BLECHNER:  Just to clarify on that last point,

14  your Honor, if we determine that it would be helpful to have a

15  magistrate assist us, do we make a written request for that or

16  should we just get in touch with the clerk or what's the

17  process?

18          THE COURT:  Uh...either way.

19          MR. BLECHNER:  Okay.

20          THE COURT:  Either way is fine.

21          And also while I have you, let me alert you to a pet

22  peeve of mine regarding the scheduling order that I will enter

23  when you send it back to me, and that pet peeve has to do with

24  requests for discovery extensions that come on the eve of the

25  cutoff or, god forbid, after the cutoff.

1            I understand that sometimes there are legitimate

2   reasons why you need an extension; the client's in a coma, there

3   was a fire at your law office.  Whatever it was, if you have a

4   good reason why you need an extension and you bring it to my

5   attention when you know about it, I am going to be reasonable

6   and you will get your extension, but if you come in at the next

7   conference that's going to be after the close of fact discovery

8   and you tell me, "um, we haven't gotten to depositions yet, you

9   know, we've been working on paper discovery," or if I get a

10  letter, you know, two days before the discovery cutoff to that

11  effect, that's going to tell me you haven't been paying

12  attention to the case because you surely knew before two days

13  before the cutoff that you weren't going to make it, and in that

14  event, I have been known to say, well, that's too bad.  If I

15  think you haven't been diligent, if I think you don't have a

16  good reason, I've been known to say no.

17            You'll see that my case management plan has a

18  procedure you should follow if the other side's not playing ball

19  with discovery.  Same principle applies if it's a third party

20  that's not playing ball.  That procedure requires you to bring

21  to my attention on a fairly short timeline any bumps in the road

22  with respect to discovery.  That's because I want to get

23  involved early and keep you on track.  If, you know, we come

24  together at the next conference and one of you tells me, "well,

25  I couldn't depose so-and-so because so-and-so still owes me

1  documents," I'm going to say, well, so-and-so's in the doghouse

2  for not giving you the documents, but you're in the doghouse for

3  not bringing it to my attention as required, so everybody's out

4  of luck.

5          I mention this not because I am expecting any problems

6  in this case, I say this whenever I enter a scheduling order or

7  discuss a scheduling order, because once in a while lawyers come

8  in at the next conference and they act surprised that I thought

9  my scheduling order was an order when they took it as a

10 suggestion, so I make it a habit of letting the lawyers know

11 that I have a little bit of a bee in my bonnet about last-minute

12 extension requests or extension requests that don't have a good

13 reason behind them, so now you know.

14         All right, anything else we should talk about now?

15 All right, I'll take that as a no.  Everybody stay well, and

16 I'll look for your scheduling order at the end of the week.

17         Thank you all.  Bye-bye.

18         MR. BLECHNER:  Thank you, Judge.

19         MR. BIALE:  Thank you, Your Honor.

20         Certified to be a true and accurate transcript.

21

22         _____

23         TABITHA DENTE, SR. COURT REPORTER

24

25